Evan Goldman (NJ Bar No.: 4289-2012)
GREENSPOON MARDER LLP
1037 Raymond Blvd Suite 900
Newark, New Jersey 07102
Phone: (732) 456-8720
Email: Evan.Goldman@gmlaw.com
*Attorneys for Plaintiffs,*
*William Minnebo and Philly Metal Supply LLC*

| | |
|---|---|
| WILLIAM MINNEBO; an individual; PHILLY METAL SUPPLY LLC, a Pennsylvania limited liability company, | SUPERIOR COURT OF NEW JERSEY, LAW DIVISION, CIVIL PART GLOUSTER COUNTY |
| Plaintiffs, | |
| vs. | DOCKET NO.: _____ |
| METAL SUPERMARKETS FRANCHISING AMERICA INC., an Ontario, Canada corporation; STEPHEN SCHOBER, an individual; and ANDREW ARMINEN, an individual; and DOES 1 – 10, inclusive, | CIVIL ACTION COMPLAINT |
| Defendants. | |

## NATURE OF THE ACTION

1.      Plaintiffs are the victims of violations of the FTC Amended Franchise Rule and state franchise laws committed by Defendants Metal Supermarkets Franchising America Inc. ("MSFA") and its principals.  Within the last year before the filing date of this Complaint, Defendants induced Plaintiffs to buy Defendants' franchise by making fraudulent representations and material omissions in the course of disclosures of financial performance, post-opening initial phase costs, and supply chain management. Plaintiffs invested more than $863,700 in the franchise, which is $426,000 over the *high* end of the range in MSFA's Franchise Disclosure Document, and this investment was lost during the first year of operating the franchise.  The relief sought includes money damages, rescission, disgorgement of unjust enrichment, declaratory judgment, punitive damages, attorney's fees and costs.

2.      After fraudulently inducing Plaintiffs into the franchise relationship, MSFA terminated the Franchise Agreement (as defined below); however, no good cause existed to terminate same.  As explained below, the Defendants' bad faith actions brought about the default

upon which Defendants based the early termination. , Defendants' actions resulted in a constructive termination of Plaintiffs franchise. There is no good cause to terminate the Franchise Agreement. Prior to sending a letter purporting to terminate the Franchise Agreement, Defendants did not issue a single notice of default. This is because Plaintiffs had not breached the Franchise Agreement. Rather, their sole default resulting in early termination – ceasing operation, was a direct result of Defendants' bad faith actions.

### THE PARTIES

3.      Plaintiff, William Minnebo, is an individual, and a Pennsylvania resident.

4.      Plaintiff, Philly Metal Supply LLC is a Pennsylvania limited liability company formed by William Minnebo to become the franchisee of a Metal Supermarkets franchise.  The headquarters, principal place of business and nerve center of operations of Philly Metal Supply LLC is in Westville, New Jersey.

5.      Defendant, Metal Supermarkets Franchising America Inc. is a franchisor that offers to individuals small-quantity metal businesses.

3.      At all relevant times, Defendant, Stephen Schober, was and is the President of MSFA and, on information and belief, is a citizen and/or resident of Ontario, Canada.

4.      At all relevant times, Defendant, Andrew Arminen, was and is the VP of Sales of MSFA and, on information and belief, is a citizen and/or resident of Ontario, Canada.

5.      Plaintiffs do not know the names and capacities of Defendants named as Does 1 – 10.  Plaintiffs will seek leave of court to amend this Complaint to state their names after they are ascertained.  Each of Does 1 – 10 participated in and is responsible in some way for the acts, omissions, violations and damages alleged and should be jointly and severally liable with the named Defendants.

### JURISDICTION, VENUE AND FORUM

6.      The Court has personal jurisdiction over Defendant MSFA, Stephen Schober and Andrew Arminen given that they offered to sell Plaintiffs a franchise in New Jersey.

7.      Venue is proper in this County pursuant to R. 4:3-2(a) and (b) because this is the County where a substantial number of the acts and transactions underlying the claim occurred and

- 2 -
Complaint

1    Plaintiffs reside in this County.

2          8.      Venue should remain in this State and County because this state has a strong interest

3    in permitting a franchisee in this state to litigate its grievances in this state, this case concerns the

4    application of a law, the New Jersey Franchise Practices Act, that provides for relief sought in this

5    action, and should be adjudicated in this state, the violations occurred in this state against Plaintiffs.

6          9.      To the extent MSFA claims a venue provision in the Franchise Agreement or other

7    ground requires the Court to change venue, that argument is incorrect.  If asserted by MSFA to be

8    mandatory, the clause violates New Jersey public policy.

9          10.     To protect a franchisee from oppressive behavior by Franchisors such as MSFA,

10   New Jersey enacted the Franchise Relations Act.  The New Jersey Legislature set forth in its

11   legislative findings that it is "necessary in the public interest to define the relationship and

12   responsibilities of franchisors and franchisees in connection with franchise agreements and to

13   protect franchisees from unreasonable termination by franchisors that may result from a disparity

14   of bargaining power between national … franchisors and small franchisees."  N.J.S.A. 56:10-2.

15   New Jersey state courts have said that a non-negotiable venue provision fixing venue outside of

16   this state is void.  *Kubis & Perszyk Assocs., Inc. v. Sun Microsystems, Inc.* 680 A.2d 618, 626 (N.J.

17   1996) ("[E]nforcement of forum-selection clauses in contracts subject to the [NJFPA] would

18   substantially undermine the protections that the [New Jersey] Legislature intended to afford to all

19   New Jersey franchisees. We hold that such clauses are presumptively invalid.").  Even in federal

20   court, the New Jersey Franchise Practices Act renders a forum selection clause unenforceable so

21   that the franchisor cannot transfer a case to his home forum unless, in accordance with the act, the

22   forum selection clause has been specifically negotiated between the parties.  *The Business Store*

23   *Inc. v. Mail Boxes Etc., et al.,* Civ. Action No. 11-3662 (D.N.J. Feb. 16, 2012) (ruling against

24   franchisor Mail Boxes Etc. on its motion to transfer venue to a California).

25         11.     In 2021 MSFA was large.  It had over a hundred franchise locations.  The venue

26   provision was nonnegotiable.  It was presented on a take-it-or-leave-it basis.

27         12.     The Legislature established the policy of this state that as a franchisee, Plaintiff has

28   the right to seek and obtain redress for claims relating to the relationship in this state.

**BACKGROUND**

13.     In March 2021 William Minnebo contacted MSFA about purchasing a franchise.

14.     In April 2021 Arminen offered to sell a franchise to Minnebo in southwest New Jersey.

15.     On or about May 1, 2021, Plaintiff entered into a Franchise Agreement with Defendant MSFA (the "2021 Franchise Agreement") for a Metals Supermarket franchise in New Jersey.  See Exhibit "A."

*Laws Regulating The Sale Of Franchises*

16.     The United States regulates the offer and sale of franchises pursuant to the FTC Amended Franchise Rule, 16 C.F.R. §436 et seq., as amended (the "Amended Rule").   The Amended Rule creates a duty upon a franchisor to prepare an offering circular containing 23 disclosure sections about the franchise offering.

17.     In Item 7 the Amended Rule requires that franchisors disclose the expenses that a prospective franchisee can expect to incur during the construction and opening of its franchise, as well as any additional expenses necessary to operate the franchised business during the initial period of operations (16 C.F.R. §§ 436.5(g).

18.     Item 19 addresses "financial performance representations"—i.e., statements to a franchisee about the revenues, expenses, or profitability of company-owned or affiliate units, franchise units, or projections of what a franchise prospect is likely to generate in revenues, expenses, and cash flows.

19.     No franchisor is required to make a FPR in its FDD Item 19.  However, if the franchisor elects to make a FPR in its FDD, Item 19 must be prepared in strict compliance with the North American Securities Administrator's Associations ("NASAA") Guidelines (16 C.F.R. § 436.5(s)(1).

20.     "FPR" is broadly defined in the NASAA Guidelines as:

[A]ny representation, including any oral, written, or visual representation, to a prospective franchisee … that states … a specific level or range of actual or potential sales, income, gross profits, or net profits … [FPRs] include[] a chart, table, or mathematical calculation that shows possible results based on a combination of variables.

Bus. Franchise Guide (CCH) ¶ 13,604 Uniform FDD, Definitions.

21.     Because MSFA elected to make FPRs in its FDD, its Item 19 must be prepared in strict compliance with the requirements in the NASAA Guidelines.

22.     The FPR must clearly state the characteristics of the included outlets that may differ from the outlet that may be offered to the prospective franchisee. Bus. Franchise Guide (CCH) ¶ 13,604 Contents, Item 19 (3)(ii).

### *Law Governing the Franchise Relationship: New Jersey Franchise Practices Act*

23.     To protect New Jersey franchisees from oppressive behavior by Franchisors such as MSFA, New Jersey enacted the Franchise Practices Act ("NJFPA").

24.     It is a violation of the NJFPA for any franchisor, directly or indirectly, through any officer, agent or employee, to impose unreasonable standards of performance upon a franchisee (N.J.S.A. § 56:10-7(e).

25.     Under the NJFPA a franchisor may only terminate a franchise with good cause (N.J.S.A. § 56:10-5).

26.     Although the Franchise Agreement contains a choice-of-law provision stating that New York law would govern, the NJFPA specifically provides that it shall be unlawful for any franchisor "to require a franchisee at time of entering into a franchise arrangement to assent to a release, assignment, novation, waiver or estoppel which would relieve any person from liability imposed by this act."  N.J.S.A. § 65:10:7.  Additionally, Section 56:10:10 provides that "[a]ny franchisee may bring an action against its franchisor for violation of this act in the Superior Court of the State of New Jersey to recover damages sustained by reason of any violation of this act…." Based on these sections, even in the face of a choice-of-law provision applying the law of New York, New York law will be overridden by the New Jersey Franchise Practices Act.  *See, e.g., B & E Juices, Inc. v. Energy Brands, Inc.*, Civ. Action No. 3:07CV1321, 2007 WL 3124903, at *11 (D. Conn. Oct. 25, 2007) (Connecticut Franchise Act applied in a case involving a New York choice of law clause because of antiwaiver provision). The antiwaiver provisions in the Connecticut Franchise Act and the New Jersey Franchise Act are similar in most material respects.

### *Material Omissions and Misleading Disclosures Re: Hierarchy of Supply Chain and Mandatory Purchases from Large Competitors*

27.    The most basic disclosure requirements of the Amended Franchise Rule are that an FDD must be non-misleading and not contain any misrepresentations.  Defendants knew they must not make the FDD misleading.  But they did any way.

28.    Item 1 requires a franchisor to make a general statement about market competition. MSFA's FDD contains a statement that franchisees may face competition from large suppliers. The FDD does not provide a definition for "competition."  However, in the same paragraph MSFA states, "large distributors typically lack inventory diversity … lack lead times that are offered by Metal Supermarket stores … [and]

29.    The distinguishing characteristics of large suppliers indicates that prospective franchisees should not expect to be downstream in the same supply chain as large retailers.

30.    The FDD contains standard restrictions that mandatory purchases must not be made from any source not approved in advance by the franchisor.  The term "large supplier" is absent in Item 8.  The absence of "large suppliers" supports the disclosures in Item 1 in that a franchisee should not expect to be downstream in the same supply chain as large retailers.

31.    Minnebo politely expressed concern about the territory seeking information about the circumstances surrounding the closing of the Norristown franchise.  The FDD did not provide the last known home number of the Norristown franchisee.  Minnebo wanted to speak to the Norristown franchisee to discuss the competition in his territory.  When asked, Arminen told Minnebo he did not have a home number telephone number or an active email address for the Norristown franchisee, but he assured Minnebo not to worry.  Arminen told Plaintiff that the Norristown franchise was lost to owner incompetence.  He made repeated assurances to Minnebo that the Norristown franchise and Philadelphia franchise did not cease operations because of competitive market forces from large suppliers.

32.    Minnebo made additional inquires but was assured the Norristown franchise and the Philadelphia franchise were lost to owner incompetence and not to competitive market forces. Andrew Arminen and Stephen Schober had 30 years' experience in the metal business.  Minnebo had no metal business experience prior to purchasing the franchise so he turned to Andrew Arminen and Stephen Schober for advice and guidance. Consequently, his decision to sign the

2021 Franchise Agreement was substantially based on representations made by MSFA in its Franchise Disclosure Document and oral representations by Defendants Andrew Arminen and Stephen Schober.

***Grossly Understated the Required Initial Investment and Working Capital Required to Operate the Franchise***

33.     The 2021 FDD provides a low high range of the preopening initial costs between $228,500 and $437,000.  MSFA states that it calculated the amounts based on thirty (30) years' experience in the small-quantity metals business.

34.     In September 2020, which was eight months after the start of the Pandemic and four months before the January 27, 2021 FDD was prepared, MSFA knew or reasonably should have known, beyond doubt, that steel and aluminum prices had skyrocketed.  But they failed to update their 2021 FDD to reflect the current market conditions.[1] Consequently, the 2021 FDD grossly understated the required initial investment cost.  Plaintiffs paid *double* the estimated cost to appropriately stock the business with inventory.

35.     Grossly understating the required initial investment and working capital required to operate the franchise contributed to causing Plaintiffs substantial damage as over the approximately 12-month period of operation gross revenues were insufficient to even just cover operating costs.

36.     Over the course of the approximately 12 months following signature of the franchise documents, as Plaintiffs were facing unsurmountable competitive market forces in the territory, Plaintiffs approached MSFA multiple times to ask for help in dealing with this market. All such requests remained essentially without result or adequate support. Minnebo made emergency loans to the business to keep it afloat.  Ultimately, he invested more than $800,000 to operate the business, which was lost within 12 months of opening the store.

***FPR Misrepresentations***

37.     In his discussions with Andrew Arminen, Minnebo was told the data in the FPRs

---

[1] The 2021 FDD estimate was only $10,000 more than the 2020 estimate of $70,000.  Plaintiffs paid at least $140,000 to appropriately stock the business with inventory.

Complaint

1    was in line with the performance figures Minnebo can expect for his New Jersey store.   But

2    Arminen failed to disclose the material differences in the Philadelphia area compared to locations

3    included in the FPRs (i.e., Defendants did not incorporate the performance of the Norristown

4    Franchise that closed in 2018 or the Philadelphia franchise that closed in 2004).  Defendants simply

5    offered the non-similar comparison, which failed to reflect material differences and Defendants

6    insisted Plaintiffs could expect substantially the same performance as reflected in the FPRs.

7            38.     Arminen stated multiple times, that "all markets are the same."  That was false.

8    Based on MSFA's experience in the Philadelphia area they knew large suppliers dominated the

9    small-quantities metal market through unusually low-cost retail sales.  Since at least 2004, they

10   knew that the supplier that they intended to be Plaintiffs main supplier would not provide

11   wholesale pricing, but retail pricing.  They waited until after Minnebo had signed the franchise

12   agreement and executed a 10-year lease to provide competitive information on pricing and

13   markets.

14                        ***Early Termination of New Jersey Franchise***

15           39.     After making extraordinary efforts to try make the franchise succeed during the

16   year after opening the franchised business, while seeing the unsurmountable obstacles, and

17   receiving canned, thoughtless responses to his calls for help from MSFA, Minnebo realized he

18   could not survive with large retailers in his territory.  He closed the business on June 2, 2022.

19           40.     Two days later, on or about June 4, 2022, Stephen Schober sent a letter to Plaintiffs

20   stating that the Franchise Agreement is terminated.  A copy of the letter is attached as Exhibit "B."

21   In it, Schober claims there is good cause for early termination of the franchise agreement because

22   Plaintiffs closed the business. The letter identified no other reason for terminating the franchise

23   agreement.

24           41.     MSFA did not have good cause for early termination.  There was no good cause

25   because the alleged default was brought about by Defendants actions.  The NJFPA is a remedial

26   statute intended to protect franchisees from oppressive behavior of franchisors such as MSFA.

27   MSFA is obligated to act in good faith prior to terminating a franchise in New Jersey.

28           42.     Pleading both additionally and in the alternative, even if good faith by Defendants

is requirement under the New Jersey Franchise Practices Act, Defendants requirement that Plaintiffs must purchase inventory from a competitor who sells the same inventory to retail customers at the same prices is actionable for being an unreasonable standard of performance. Below is an excerpt from an article written by Stephen Schober in October 2019, "Franchising in a niche industry: what you need to Know". In it, he stressed competitive pricing:

Simply put, as we used to ask, "will the dog eat the biscuit?"

Do you truly understand the cost structure? What would you need to sell it for? Is that going to be acceptable to potential customers? Is it truly distinctive, unique, or superior? Can marketing attract customers or, even better, make your product or service unrivaled – and thus defensible?

Consider the prospective customers you plan to serve. Question if you would purchase the product or service at the price it would be sold for, and if there is an established need for others to do the same.

You must be confident in the logic behind the franchise – too often, brands that fail are trying to follow a trend that is unsustainable and will fade, or the offering is not specific, distinctive, or targeted enough to succeed.

This is much more than identifying and simply pursuing a demographic because of your instinctual knowledge or past professional experiences and believing that is your target market – you need to cut through the clutter and do some real research.

> "Too often, brands that fail are trying to follow a trend that is unsustainable and will fade"

***Post-Termination Obligations***

43.    In the termination letter, MSFA claims that it has properly terminated the Franchise Agreement and that, as a result thereof:

A.    The Plaintiffs must sell the assets of the terminated franchise to Defendants and assign the lease for franchise location.[2]

B.    The Plaintiffs must not solicit customers and vendors.

---

[2] The Franchise Agreement gives the franchisor 30 days to notify the franchisee of its decision to purchase the assets of the franchise and demand a lease assignment for the franchise location. MSFA waived the purchase option by failing to give notice prior to July 2, 2022, which is 30 days after the date of the termination notice.

C.      That the Plaintiffs cannot, for a period of two years after termination, engage in any metal supply business located within ten miles of Plaintiff's franchise location; within five miles of any other Metal Supermarket store. (Fr. Agrmt. §10.4).

44.     Plaintiffs contend that Defendants did not have good cause to terminate the Franchise Agreement, that the Franchise Agreement was not properly terminated and that the proper termination of the Franchise Agreement is a condition precedent to any post-termination requirement.

45.     Plaintiffs also contend that the post-termination noncompete clause is unreasonably overbroad in duration and geographic scope and that the nonsolicitaiton clause unfairly limits competition as it does not protect any legitimate business interests of MSFA.  Defendants brought about the default upon which Defendants based the termination. They cannot benefit from their own wrongdoing.

**<u>FIRST COUNT</u>**
**VIOLATIONS OF THE NEW YORK FRANCHISE SALES ACT (Gen. Bus. Law § 687)**

46.     All above paragraphs are incorporated here by this reference.

47.     At all relevant times, the individual Defendants, Arminen and Schober were Franchise sales agents as that term is defined in the New York Franchise Sales Act ("NYFSA").

48.     Philly Metal Supply LLC was a franchisee as the term franchisee is defined in the Franchise Sales Act.

49.     Defendants committed fraud, fraudulent practices, and deceit, as those terms are defined in the New York Franchise Sales Act.

50.     To the extent Defendants claim a provision in the contract or other grounds disclaim reliance on alleged fraudulent statements, that argument is incorrect.  The nonwaiver clauses of the New York Franchise Sales Act specifically prohibit merger and integration clauses that would deprive the franchisee of its claims under the Act.  The New York Franchise Sales Act has a broad anti-waiver provision, and a franchisor cannot disclaim reliance with a provision in a contract or other document.

51.     The Act makes it "unlawful for a person, in connection with the offer, sale or

purchase of any franchise, to directly or indirectly … omit to state a material fact necessary in order to make the statements made *not misleading* … [e]ngage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  (GBL § 687) (emphasis added).

52.    Defendants violated the Act by making untrue statements of material fact and omitted necessary facts in order to make statements made not misleading.

53.    Defendants violated § 687 of the Franchise Sales Act were willful and material.

54.    Defendants violations of § 687 caused and continue to cause the Plaintiffs damage.

**SECOND COUNT**
**FRAUD BY MAKING MATERIAL FALSE STATEMENTS AND OMITTING MATERIAL FACTS TO INDUCE PLAINTIFF TO ENTER INTO AGREEMENT**

55.    All above paragraphs are incorporated here by this reference.

56.    The FTC Franchise Rule, 16 CFR Part 436, the New York Franchise Sales Act, GBL Sec. 687, requires Defendants to provide truthful and accurate information to the Plaintiffs and to not mislead them.  The FTC Rule and NYFSA prohibit Defendants from making any such representation, but they did so anyway.

57.    The New York Franchise Sales Act prohibits Defendants from making any untrue statement of a material fact or omit to state a material fact necessary in order to have the statements made, in light of the circumstances under which they were made, not misleading in the offer or sale of franchises.

58.    Defendants committed fraud by knowingly making false representations to William Minnebo for the purpose of inducing Minnebo to enter into the Franchise Agreement. This is evident in that the representations were communicated to Mr. Minnebo in the franchise sale process in circumstances in which Minnebo was a potential franchisee.

59.    The false representations made by Defendants include, but are not limited to, providing FPRs (non-similar financial comparison to franchises in other territories that were not required to make ongoing purchases from a competitor who sold the same inventory to a franchisee's primary customer base at the same retail price) indicating that the data was in line with

what Minnebo could expect for his location, false statements about external competition in Plaintiffs territory, made orally by Andrew Arminen and Stephen Schober, and false statements about the Norristown and Philadelphia franchise made orally by Andrew Arminen and Stephen Schober.

60.     Defendants knew that Mr. Minnebo would rely on the statements in making a decision to purchase the investment that Defendants were offering.  They knew Minnebo had never purchased or operated a franchise business in the past.  They knew he knew that they had over thirty (30) years of experience in the small-quantity metal business.

61.     When Andrew Arminen and Stephen Schober made these misrepresentations, they knew they were misrepresenting material facts. They were making false statements.  Defendants knew they lacked basis to represent the facts and/or acted in reckless disregard of whether they had a reliable basis for the representations made. Defendants had the requisite scienter.

62.     Plaintiffs relied on the misrepresentation to their detriment.  Plaintiffs relied by making the investment in the purchase of the franchise, executing the Franchise Agreement, expending monies to establish the Metals Supermarket store and suffering substantial losses in the operation of the franchise.

63.     Plaintiffs were damaged in amounts to be proved at trial including investment costs and operating losses.

64.     The conduct of Defendants as alleged herein was willful, oppressive, malicious, and in wanton and conscious disregard of Plaintiffs' rights.  Accordingly, punitive damages should be assessed against each Defendant in an amount that will be sufficient to deter them from engaging in such conduct in the future.

65.     Plaintiffs demand rescission additionally and in the alternative and not as an election of remedies and not as a binding commitment to a specific allegation of fact, Plaintiffs rescind the Franchise Agreement and all ancillary agreements. Service of this Complaint constitutes demand for rescission.  Plaintiffs tender to return to Defendants everything of value received with the requirement that Defendants do the same.  On balance Plaintiffs did not receive value but only suffered losses from the misconduct of Defendants. In contrast, Defendants received

substantial monies and value to be restored to Plaintiffs.  Plaintiffs also request rescission on all other applicable grounds including but not limited to misrepresentation, misrepresentation by omission, mistake and failure of consideration.

### THIRD COUNT
### VIOLATIONS OF NEW YORK DECEPTIVE ACTS AND PRACTICES ACT

66.     All above paragraphs are incorporated here by this reference.

67.     At all relevant times, the Defendants were engaged in the business of offering, selling, developing, and servicing Metal Supermarket stores.

68.     In conducting such business, the Defendants engaged in deceptive trade practices. The Defendants engaged in acts and practices that were misleading in a material respect.

69.     As a direct and proximate result of the Defendants' misleading and deceptive acts and practices, the Plaintiffs were and continued to be injured.

70.     Defendants conduct violated New York law prohibiting and making unlawful deceptive acts or practices in the conduct of any business, trade or commerce (GBL § 349).

71.     Plaintiffs are entitled to recover their actual damages and reasonable attorneys' fees pursuant to New York Law making deceptive acts and practices unlawful (GBL § 349).

### FOURTH COUNT
### NEGLIGENT MISREPRESENTATION

72.     All above paragraphs are incorporated here by this reference.

73.     Each Defendant owed a duty to Plaintiffs to provide full and accurate information regarding the Norristown Franchisee, costs involved to start and operate the franchise in the Plaintiffs territory, and the requirement to purchase inventory from a large supplier that sold small-quantity metal to Plaintiffs primary retail customer base at the same price these large suppliers were charging Plaintiffs, that the large competitor previously sold inventory at a discount but no longer did.

74.     Defendants breached the duty by stating false and incorrect and inaccurate information and omitting to state material factual information necessary to make the statements

1    made, not false or misleading.

2    75.    Plaintiffs were damaged by Defendants breach of their duty, in an amount to be

3    provide at trial.

4    76.    Defendants actions and omissions are being conducted and were made with

5    oppression, fraud and malice, entitling Plaintiffs to punitive damages.

6

7    **FIFTH COUNT**
     **VIOLATIONS OF THE NEW JERSEY FRANCHISE PRACTICES ACT –**
8    **CONSTRUCTIVE TERMINATION**

9    77.    All above paragraphs are incorporated here by this reference.

10   78.    The relationship among Philly Metal Supply LLC and MSFA is a franchise, as the

11   term franchise is defined in the New Jersey Franchise Practices Act (N.J.S.A. 56:10-3).

12   Specifically, Philly Metal Supply LLC is a franchisee because it has written agreements for a

13   definite period with MSFA that granted Philly Metal Supply LLC a license to use MSFA's

14   intellectual property and, as explained in detail above, there is a community of interest among the

15   parties to promote the Metal Supermarket brand.

16   79.    Philly Metal Supply LLC operated its franchise "within the State of New Jersey."

17   Philly Metal Supply LLC's paid franchise fees in an amount that exceeds $90,000 pursuant to the

18   Franchise Agreement for the twelve months preceding the filing date of this complaint, and over

19   80% of Philly Metal Supply LLC's gross sales were intended to be or are derived from the franchise

20   relationship.

21   80.    N.J.S.A. 56:10-5 provides that the relationship between Philly Metal Supply LLC

22   and MSFA cannot be terminated, cancelled, or non-renewed without good cause.

23   81.    MSFA has violated the New Jersey Franchise Practices Act by terminating

24   Plaintiffs franchise, through both actual and constructive termination, without good cause.

25   82.    Defendants brought about the default upon which it based its notice of termination

26   (i.e., closure of Plaintiffs franchise).

27   83.    Defendants imposed unreasonable standards of performance upon Plaintiffs by

28   sourcing Plaintiffs to large competitors for ongoing purchases.

84.     No good cause existed to terminate Plaintiffs franchise.

85.     Plaintiffs are being and have been and will be damaged by the acts and omissions of Defendants that comprised wrongful termination, in violation the Franchise Relations Act.

86.     Under the Act Plaintiffs are entitled to recover reasonable attorney's fees and costs. Plaintiffs request reasonable attorney's fees and costs.

## SIXTH COUNT
## BREACH OF CONTRACT

87.     All above paragraphs are incorporated here by this reference.

89.     Plaintiffs performed all obligations under the Franchise Agreement and any obligations not performed have been excused.

90.     Pleading in the alternative and not as an election of claims or remedies, by purporting to terminate and/or terminating the Franchise Agreement without grounds for termination MSFA breached and is breaching the Franchise Agreements. Defendants breached the provisions establishing the term or duration of the franchise and the provisions concerning grounds for termination, by purporting to terminate early without having grounds to do so.  Defendants also breached the provisions establishing its support obligation.

91.     The breaches are causing and will cause damage to Plaintiffs in an amount to be proved at trial.

## SEVENTH COUNT
## DECLARATORY JUDGMENT

92.     N.J.S.A. 2A:16-50 authorizes the Court to determine the rights of the parties to a contract where an actual controversy exists.  The parties need a judicial declaration to guide their future conduct.

93.     There exists a controversy between Plaintiffs and Defendants in that Plaintiffs contend that Defendants did not have good cause for early termination under the New Jersey Franchise Relations Act.

94.     There exists a controversy between Plaintiffs and Defendants in that Plaintiffs contend that Defendants did not have did not have legitimate grounds for early termination under

the Franchise Agreement.

95.     Plaintiffs contend that Defendants imposed unreasonable standards of performance upon Plaintiffs in violation of the New Jersey Franchise Practices Act.  Defendants deny this.

96.     Defendants contend that Plaintiffs voluntarily abandoned the franchise by closing the store.  Plaintiffs deny that any abandonment was voluntary and that Defendants actions brought about the default upon which it based its letter of termination.

97.     There exists a controversy between Plaintiffs and Defendants in that Defendants deny that the NJFPA includes a good faith requirement. Plaintiffs contend MSFA failed to act in good faith by not disclosing that it knew

98.     Plaintiffs contend that there was no valid termination and therefore Plaintiffs are not required to comply with the post-termination obligations in the Franchise Agreement.

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendant, and each of them, as follows:

1.     Actual damages in an amount to be proved at trial but at least $1,000,000.

2.     For disgorgement of unjust enrichment and restitution in amounts to be proven at trial.

3.     A declaratory judgment that Defendants did not have grounds for early termination under the Franchise Agreement.

4.     A declaratory judgment that Defendants imposed unreasonable standards of performance upon Plaintiffs and there was no good cause to terminate Plaintiffs franchise under the New Jersey Franchise Practices Act.

5.     A declaratory judgment that Defendants bad faith actions resulted in a constructive termination of the Plaintiffs franchise in violation of the New Jersey Franchise Practices Act.

6.     A declaratory judgment that Defendants acted in bad faith in violation of the New Jersey Franchise Practices Act and there was not good cause to terminate Plaintiffs.

7.     A declaratory judgment the post-term noncompete provisions are unenforceable as a matter of law.

9.     Attorney's fees and costs as provided by the Franchise Agreement and/or applicable law.

10.    For interest as allowed by law.

11.    For such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED: August 3, 2022                    **GREENSPOON MARDER LLP**

/s/ *Evan Goldman*
Evan Goldman, Esq.
*Attorneys for Plaintiffs, William Minnebo and Philly Metal Supply LLC*

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues triable by jury pursuant R: 1:8-2(b) and 4:35-1(a).  Any purported contractual pretrial jury waiver is unenforceable under applicable law.

**GREENSPOON MARDER LLP**

/s/ *Evan Goldman*
Evan Goldman
*Attorneys for Plaintiffs, William Minnebo and Philly Metal Supply LLC*

## DESIGNATION OF TRIAL COUNSEL

Plaintiffs will be represented at trial by Evan Goldman, Esq.

**GREENSPOON MARDER LLP**

/s/ *Evan Goldman*
Evan Goldman
*Attorneys for Plaintiffs, William Minnebo and Philly Metal Supply LLC*



New Jersey Judiciary
Civil Practice Division

# Civil Case Information Statement (CIS)

Use for initial Law Division Civil Part pleadings (not motions) under Rule 4:5-1.
Pleading will be rejected for filing, under Rule 1:5-6(c), if information above the
black bar is not completed, or attorney's signature is not affixed.

## For Use by Clerk's Office Only

| Payment type ☐ check ☐ charge ☐ cash | Charge/Check Number | Amount $ | Overpayment $ | Batch Number |
|---|---|---|---|---|

| Attorney/Pro Se Name | Telephone Number | County of Venue |
|---|---|---|
| Evan Goldman | (732) 456-8720  ext. | Gloucester |

| Firm Name (if applicable) | Docket Number (when available) |
|---|---|
| Greenspoon Marder LLP | |

| Office Address **-** Street | City | State | Zip |
|---|---|---|---|
| 1037 Raymond Blvd, Suite 900 | Newark | NJ | 07102 |

| Document Type | Jury Demand |
|---|---|
| Complaint | ■ Yes    ☐ No |

| Name of Party (e.g., John Doe, Plaintiff) | Caption |
|---|---|
| William Minnebo and Philly Metal Supply LLC, Plaintiffs | William Minnebo and  Philly Metal Supply LLC v. Metal Supermarkets Franchising America Inc., Stephen Schober, and Andrew Arminen |

Case Type Number (See page 3 for listing)  999

| Are sexual abuse claims alleged? | ☐ Yes | ■ No |
|---|---|---|
| Does this case involve claims related to COVID-19? | ☐ Yes | ■ No |
| Is this a professional malpractice case? | ☐ Yes | ■ No |

    If "Yes," see N.J.S.A. 2A:53A-27 and applicable case law
    regarding your obligation to file an affidavit of merit.

| Related Cases Pending? | ☐ Yes | ■ No |
|---|---|---|

    If "Yes," list docket numbers

| Do you anticipate adding any parties (arising out of same transaction or occurrence)? | ☐ Yes | ■ No |
|---|---|---|

| Name of defendant's primary insurance company (if known) | ☐ None | ■ Unknown |
|---|---|---|

| **The Information Provided on This Form Cannot be Introduced into Evidence.** |
|---|

Case Characteristics for Purposes of Determining if Case is Appropriate for Mediation

Do parties have a current, past or recurrent relationship?   ☐ Yes   ■ No

If "Yes," is that relationship:

☐ Employer/Employee   ☐ Friend/Neighbor   ☐ Familial   ☐ Business

☐ Other (explain) _____

---

Does the statute governing this case provide for payment of fees by the losing party?   ☐ Yes   ■ No

---

Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition.

---

Do you or your client need any disability accommodations?   ☐ Yes   ■ No

If yes, please identify the requested accommodation:

Will an interpreter be needed?   ☐ Yes   ■ No

If yes, for what language?

---

**I certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).**

Attorney/Self-Represented Litigant Signature:   _/s/ Evan Goldman_____

# Civil Case Information Statement (CIS)

Use for initial pleadings (not motions) under *Rule* 4:5-1

## CASE TYPES

(Choose one and enter number of case type in appropriate space on page 1.)

### Track I - 150 days discovery

| | |
|---|---|
| 151 | Name Change |
| 175 | Forfeiture |
| 302 | Tenancy |
| 399 | Real Property (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction) |
| 502 | Book Account (debt collection matters only) |
| 505 | Other Insurance Claim (including declaratory judgment actions) |
| 506 | PIP Coverage |
| 510 | UM or UIM Claim (coverage issues only) |
| 511 | Action on Negotiable Instrument |
| 512 | Lemon Law |
| 801 | Summary Action |
| 802 | Open Public Records Act (summary action) |
| 999 | Other (briefly describe nature of action) |
| | Franchise Contract |

### Track II - 300 days discovery

| | |
|---|---|
| 305 | Construction |
| 509 | Employment (other than Conscientious Employees Protection Act (CEPA) or Law Against Discrimination (LAD)) |
| 599 | Contract/Commercial Transaction |
| 603N | Auto Negligence – Personal Injury (non-verbal threshold) |
| 603Y | Auto Negligence – Personal Injury (verbal threshold) |
| 605 | Personal Injury |
| 610 | Auto Negligence – Property Damage |
| 621 | UM or UIM Claim (includes bodily injury) |
| 699 | Tort – Other |

### Track III - 450 days discovery

| | |
|---|---|
| 005 | Civil Rights |
| 301 | Condemnation |
| 602 | Assault and Battery |
| 604 | Medical Malpractice |
| 606 | Product Liability |
| 607 | Professional Malpractice |
| 608 | Toxic Tort |
| 609 | Defamation |
| 616 | Whistleblower / Conscientious Employee Protection Act (CEPA) Cases |
| 617 | Inverse Condemnation |
| 618 | Law Against Discrimination (LAD) Cases |

## Track IV - Active Case Management by Individual Judge / 450 days discovery

| | |
|---|---|
| 156 | Environmental/Environmental Coverage Litigation |
| 303 | Mt. Laurel |
| 508 | Complex Commercial |
| 513 | Complex Construction |
| 514 | Insurance Fraud |
| 620 | False Claims Act |
| 701 | Actions in Lieu of Prerogative Writs |

## Multicounty Litigation (Track IV)

| | |
|---|---|
| 271 | Accutane/Isotretinoin |
| 281 | Bristol-Myers Squibb Environmental |
| 282 | Fosamax |
| 285 | Stryker Trident Hip Implants |
| 291 | Pelvic Mesh/Gynecare |
| 292 | Pelvic Mesh/Bard |
| 293 | DePuy ASR Hip Implant Litigation |
| 296 | Stryker Rejuvenate/ABG II Modular Hip Stem Components |
| 299 | Olmesartan Medoxomil Medications/Benicar |
| 300 | Talc-Based Body Powders |
| 601 | Asbestos |
| 624 | Stryker LFIT CoCr V40 Femoral Heads |
| 625 | Firefighter Hearing Loss Litigation |
| 626 | Abilify |
| 627 | Physiomesh Flexible Composite Mesh |
| 628 | Taxotere/Docetaxel |
| 629 | Zostavax |
| 630 | Proceed Mesh/Patch |
| 631 | Proton-Pump Inhibitors |
| 632 | HealthPlus Surgery Center |
| 633 | Prolene Hernia System Mesh |
| 634 | Allergan Biocell Textured Breast Implants |
| 635 | Tasigna |
| 636 | Strattice Hernia Mesh |
| 637 | Singulair |
| 638 | Elmiron |

If you believe this case requires a track other than that provided above, please indicate the reason on page 1, in the space under "Case Characteristics".

**Please check off each applicable category**

☐ **Putative Class Action**     ☐ **Title 59**     ☐ **Consumer Fraud**

# EXHIBIT A



# METAL SUPERMARKETS
# FRANCHISE AGREEMENT

**PHILLY METAL SUPPLY, LLC**

FRANCHISEE

**APRIL 15, 2021**

DATE OF AGREEMENT

TABLE OF CONTENTS

Page

1.  INTRODUCTION AND DEFINITIONS. ....................................................... 1
    1.1  Metal Supermarkets Stores ............................................................. 1
    1.2  Acknowledgments ........................................................................... 1
    1.3  Your Representations ...................................................................... 2
    1.4  Definitions....................................................................................... 2
2.  GRANT OF RIGHTS. ................................................................................. 5
    2.1  Grant of Franchise .......................................................................... 5
    2.2  Selection of Location ...................................................................... 5
    2.3  Your Territorial Protection ............................................................. 6
    2.4  Our Reservation of Rights ............................................................... 6
    2.5  Limits on Where You May Sell........................................................ 6
3.  FEES. ........................................................................................................... 7
    3.1  Initial Franchise Fee ....................................................................... 7
    3.2  Monthly Royalty Fees ..................................................................... 7
    3.3  Interest On Late Payments; Late Fees ............................................ 8
    3.4  Electronic Transfer of Funds........................................................... 8
    3.5  Application of Payments; Offsets .................................................... 9
    3.6  Brand Fund Contribution................................................................. 9
    3.7  Advertising Expenditures .............................................................. 10
    3.8  Conference Fee .............................................................................. 10
    3.9  Tax Payments ................................................................................ 11
4.  DEVELOPMENT OF YOUR STORE......................................................... 11
    4.1  Purchase or Lease of Premises ..................................................... 11
    4.2  Development and Opening of Your Store....................................... 12
    4.3  Equipment, Furniture and Signs ................................................... 12
    4.4  Telephone, E-Mail and Other Telecommunications Services Numbers ....... 13
    4.5  Pre-Opening Assistance ................................................................ 13
    4.6  Initial Customer List ..................................................................... 13
    4.7  Customer Information..................................................................... 13
5.  TRAINING AND GUIDANCE. .................................................................. 14
    5.1  Initial Training Program ............................................................... 14
    5.2  On-Going Guidance....................................................................... 14
    5.3  Sales and Marketing Assistance ................................................... 14
    5.4  Periodic Visits............................................................................... 15
    5.5  Operations Manual ........................................................................ 15
6.  YOUR ORGANIZATION AND MANAGEMENT ..................................... 15
    6.1  Disclosure of Ownership Interests ................................................ 15
    6.2  Management of Store...................................................................... 15
7.  OPERATING STANDARDS. ..................................................................... 16
    7.1  Authorized Metals and Other Products and Services.................... 16
    7.2  Purchase of Metals and Other Products ........................................ 16

| | | |
|---|---|---|
| 7.3 | Condition of Store | 17 |
| 7.4 | Specifications and Standards | 17 |
| 7.5 | Compliance With Laws | 18 |
| 7.6 | Personnel | 18 |
| 7.7 | Insurance | 18 |
| 7.8 | Advertising | 19 |
| 7.9 | Online Sites | 20 |
| 7.10 | Brand Fund | 21 |
| 7.11 | Payment of Taxes | 22 |
| 7.12 | Payment of Trade Creditors | 22 |
| 7.13 | Your Right to Contest Liabilities | 22 |
| 7.14 | E-Commerce | 22 |
| 8. | REPORTS AND INSPECTIONS | 22 |
| 8.1 | Records | 22 |
| 8.2 | Computer System | 23 |
| 8.3 | Periodic Reports | 24 |
| 8.4 | Inspections; Other Store Visits | 24 |
| 8.5 | Audits | 24 |
| 8.6 | Privacy | 25 |
| 8.7 | Credit Cards and PCI Compliance | 25 |
| 8.8 | Extranet | 26 |
| 9. | TRADEMARKS | 26 |
| 9.1 | Ownership of the Marks | 26 |
| 9.2 | Use of the Marks | 26 |
| 9.3 | Discontinuance of Use of Marks | 27 |
| 9.4 | Infringements and Claims | 27 |
| 10. | RESTRICTIVE COVENANTS | 28 |
| 10.1 | Confidential Information | 28 |
| 10.2 | In-Term Covenants | 28 |
| 10.3 | Information Exchange | 29 |
| 10.4 | Post-Term Covenants | 29 |
| 10.5 | Non-Solicitation | 30 |
| 10.6 | Personal Covenants | 30 |
| 11. | TRANSFER OF AGREEMENT | 30 |
| 11.1 | Transfer by You Subject to Our Approval | 30 |
| 11.2 | Conditions for Approval | 31 |
| 11.3 | Transfer To A Corporation | 33 |
| 11.4 | Special Transfers | 33 |
| 11.5 | Death or Disability of Franchisee | 33 |
| 11.6 | Franchisor's Right of First Refusal | 33 |
| 11.7 | Securities Offerings By Franchisee | 34 |
| 11.8 | Franchisee Bankruptcy | 35 |
| 11.9 | Transfer by Franchisor | 35 |
| 12. | TERMINATION OF AGREEMENT | 35 |

| 12.1 | Immediate Termination | 35 |
| 12.2 | Termination Upon Notice | 36 |
| 12.3 | Termination Upon Notice and Opportunity to Cure | 36 |
| 13. | RIGHTS TO A SUCCESSOR FRANCHISE | 37 |
| 13.1 | Your Right To Acquire A Successor Franchise | 37 |
| 13.2 | Notices | 37 |
| 13.3 | New Agreements | 37 |
| 13.4 | Holdover Situation | 38 |
| 14. | EFFECT OF TERMINATION OR EXPIRATION | 38 |
| 14.2 | Discontinue Use of Marks and Confidential Information | 38 |
| 14.3 | Customer Lists | 39 |
| 14.4 | Our Option To Purchase Your Store | 40 |
| 14.5 | Continuing Obligations | 41 |
| 15. | RELATIONSHIP OF THE PARTIES. | 41 |
| 15.1 | Independent Contractors | 41 |
| 15.2 | Your Independence | 41 |
| 15.3 | Indemnification | 42 |
| 15.4 | Taxes | 42 |
| 16. | MISCELLANEOUS | 42 |
| 16.1 | Mediation | 42 |
| 16.2 | Venue | 43 |
| 16.3 | Governing Law | 43 |
| 16.4 | Injunctive Relief | 43 |
| 16.5 | Costs and Attorneys' Fees | 44 |
| 16.6 | Limitations on Legal Claims | 44 |
| 16.7 | Severability and Substitution of Provisions | 44 |
| 16.8 | Waiver of Obligations | 45 |
| 16.9 | Exercise of Rights | 45 |
| 16.10 | Construction | 46 |
| 16.11 | Anti-Terrorism Laws | 46 |
| 16.12 | Our Reasonable Business Judgment | 47 |
| 16.13 | Notices and Communications | 47 |
| 16.14 | Receipt of Disclosure Document and Agreement | 48 |
| 16.15 | General Release | 48 |

- Schedule A – Protected Area
- Schedule B – Premises
- Schedule C – Directors And Officers
- Schedule D – Owners' Personal Guaranty Of Franchisee's Obligations
- Schedule E – Franchisee Acknowledgment Addendum
- Schedule F – Electronic Transfer Of Funds Authorization
- Schedule G – Successor Franchise Addendum / Transferee Franchise Addendum

# METAL SUPERMARKETS
# FRANCHISE AGREEMENT

**THIS AGREEMENT** (including all Schedules, the "Agreement") is made as of the **15th** day of **APRIL, 2021** by and between:

- **METAL SUPERMARKETS FRANCHISING AMERICA INC.** ("Franchisor" or "we"), an Ontario corporation, with its principal business offices located at 520 Abilene Drive, Mississauga, Ontario L5T 2H7 Canada; and

- **PHILLY METAL SUPPLY, LLC** ("Franchisee" or "you"), a state of Pennsylvania limited liability company, whose principal address is **1137 NAAMANS CREEK RD, GARNET VALLEY, PA 19060** e-mail: **WILLIAM@ZOMEA.COM**. Tel: **484.905.1112**

## 1.    INTRODUCTION AND DEFINITIONS.

### 1.1    Metal Supermarkets Stores

We franchise Metal Supermarkets stores in the United States. Our Affiliate, MSKS IP Inc. ("MSKS"), owns a system for developing and operating Metal Supermarkets stores (collectively, the "System" as more fully defined below). MSKS has granted to its subsidiary, Metal Supermarkets Service Company Inc. ("MSSC") an exclusive license to use, and to sublicense others to use, the System. MSSC has in turn granted to us an exclusive license to use, and to sublicense others to use, the System in the United States. We, MSKS or MSSC may periodically improve or otherwise change the System.

### 1.2    Acknowledgments

You acknowledge and agree that:  (a) you have carefully read this Agreement and our franchise disclosure document (including all exhibits); (b) you understand the terms of this Agreement and the Ancillary Agreements and accept them as being reasonable and necessary for us to maintain brand standards, the uniformity of our high quality standards at all Metal Supermarkets stores, and to protect the goodwill of the Marks and the integrity of the System for our benefit as well as the benefit of our franchisees generally; (c) you have conducted an independent investigation of the business contemplated by this Agreement and recognize that an investment in a Metal Supermarkets store involves business risks, that its success is largely dependent on your own abilities, efforts and financial resources and that the nature of the business of Metal Supermarkets stores may change over time; (d) you have had the opportunity to seek advice of legal counsel of your choosing regarding the terms of this Agreement and the Ancillary Agreements; (e) you have not received or relied on any representation, warranty, guarantee or assurance, express, implied or collateral, as to the revenues, profits or success of the business contemplated by this Agreement; (f) MSKS owns, and has indirectly granted to us, an exclusive license to use, and to sublicense others to use, all of the rights and title to the Metal Supermarkets business and system as it is currently operated and as it may change over time due to changes and enhancements to the System, business offering, or methods of conducting business; and (g) you do not have any rights or title to any of the business methods or technologies that are used in connection with the System other than those that are expressly granted by this Agreement or the Ancillary Agreements.

### 1.3   Your Representations

You represent and warrant to us, and agree, that:  (a) neither you nor any of your Owners has made any untrue statement of any material fact or has omitted to state any material fact in obtaining the rights granted hereunder; (b) neither you nor any of your Owners has any direct or indirect legal or beneficial interest in a Competitive Business (as defined below), except as completely and accurately disclosed in your original franchise application; and (c) the execution and performance of this Agreement or any Ancillary Agreement will not violate any other agreement to which you or any of your Owners may be bound.  You recognize that we have approved your franchise application or renewal in reliance on all of the statements you and your Owners have made in connection therewith.

### 1.4   Definitions

The terms listed below have the meanings which follow them and include the plural as well as the singular.  Other terms are defined elsewhere in this Agreement in the context in which they arise.

(a)   "Affiliate" means any person or entity that directly or indirectly holds an ownership interest in or controls the referenced party, that is directly or indirectly owned or controlled by the referenced party, or that is under common control with the referenced party.

(b)   "Ancillary Agreement" means any agreements that you are required to enter into under the terms of this Agreement.

(c)   "Competitive Business" means any business enterprise that offers or sells metals, and/or metal processing services (which include but are not limited to the fabricating, painting, welding, polishing, notching, galvanizing, bending, drilling, punching or cutting of metal), or any products or services that are the same as or similar to the products and/or services authorized to be offered by Metal Supermarkets stores.

(d)   "Confidential Information" means proprietary and confidential information owned by us or our Affiliates relating to the development or operation of Metal Supermarkets stores whether expressly identified as confidential or not, and whether contained in the Operations Manual or otherwise, including, but not limited to:  (1)  technical information and expertise relating to metals and the equipment used in connection therewith (including, but not limited to, as posted on the "Metal Library"); (2) sourcing information for metals and metal related products; (3) site selection criteria for Metal Supermarkets stores; (4) data bases of potential customers for Metal Supermarkets stores; (5) sales and marketing programs and techniques for Metal Supermarkets stores; (6) Customer Information; (7) knowledge of operating systems, results and financial performance of Metal Supermarkets stores, other than Metal Supermarkets stores that you own; (8) comprehensive methods of operating Metal Supermarkets stores including the distinctive part numbering system and methodology; and (9) computer systems, technology and software programs.

(d)   "Consumer Price Index" ("CPI") means the index number in the table relating to "Consumer Price Index – U.S. City Average, 1982-84=100; all Items, for Urban Wage Earners and Clerical Workers" as presently published in the "Monthly Labor Review" of the Bureau of Labor Statistics for the U.S. Department of Labor (the "Bureau").  In the event the Bureau ceases publishing the Consumer Price Index or materially changes the methods of its computation or other features of it, we may substitute comparable statistics on the purchasing power of the consumer dollar published by the Bureau, another governmental agency or a responsible financial periodical or recognized authority to be chosen by us.

(e)   "Customer Information" means contact information (including name, address, phone and fax numbers, social media addresses and e-mail addresses), sales and payment history, corporate

background and ownership, and all other information about (i) any person or entity included on any marketing or customer list provided by us to you, (ii) any person or entity who has purchased or purchases products and/or services from you during the Term (even if you have solicited the person and/or established a relationship independent of us and without our assistance) or who you have solicited to purchase any goods and/or services, (iii) any person or entity in your Protected Area who purchases products and/or services from us, (iv) any person or entity for whom you provide services on our behalf or at our direction; and (v) if customer is a corporation, partnership or limited liability company, all employees of such corporation, partnership or limited liability company.

   (f) "Dollars" "($)" means U.S. Dollars (US$).

   (g) "Existing Franchise Agreements" means agreements that you or your Owners have entered into with us or our Affiliates or predecessors before today for the operation of other Metal Supermarkets stores.

   (h) "Extranet" means the proprietary on-line password protected World Wide Web interface that we use to communicate information, host the Operations Manual and other System-related information, and link to preferred vendors and suppliers. The current Extranet (or any substitute technology) system is also referred to as the "Metal Library."

   (i) "Gross Sales" means all revenue from the sale of all services and products and all other revenue of every kind and nature related to, derived from, or originating from the Store and the business operated under this Agreement, including barter and the proceeds of any business interruption insurance policies, whether for cash or credit, and regardless of theft, or of collection. Gross Sales does not include (i) sales taxes or other taxes that you collect from customers and actually pay to the appropriate taxing authorities, or (ii) revenue from the sale of products to other Metal Supermarkets stores.

   (j) "Initial Training Program" means the training associated with basic Store operations and proper use of the System, including on-line, in-store, in-class or otherwise, at such time(s) and location(s) as we may periodically designate, as provided in Section 5.1 below.

   (k) "Internet" means any and all digital means of communications, including but not limited to through computers, television, telephone, facsimile and any other communication or communication capable device, the World Wide Web, proprietary online services, social media platforms, social networking platforms, blogs, e-mail, SMS (text) messaging, news groups and electronic bulletin boards and forums, mobile applications, and the like, whether those means are currently in use or invented or developed in the future.

   (l) "Manager" (or "Store Manager") means the person you designate to be responsible for the day-to-day management of the Store, if applicable.

   (m) "Marks" means certain trade names (for example, the "METAL SUPERMARKETS" mark and logo), service marks, trademarks, logos, emblems, and indicia of origin that we may periodically specify in writing for use in connection with the System.

   (n) "Metal Supermarkets stores" means warehouse and distribution centers, offering a wide variety of metals and related materials and services to machine shops, tool and die makers, fabricators, manufacturing companies, maintenance and engineering departments and to a variety of other customers and individuals that are identified by the Marks and use the System.

(o)     "<u>Official Senders</u>" means any of our employees, vendors, and affiliates who need to send you correspondence on matters pertaining to the Store.

(p)     "<u>Online Site</u>" means one or more related documents, designs, pages, or other communications that can be accessed through electronic means, including, but not limited to, the Internet, World Wide Web, webpages, microsites, social networking sites (e.g., Facebook, Twitter, LinkedIn, You Tube, Google Plus, Pinterest, Instagram, etc.), blogs, vlogs, applications to be installed on mobile devices (e.g., iPad or Droid apps), and other applications, etc.

(q)     "<u>Operating Principal</u>" means an Owner who has completed, to our satisfaction, any initial and on-going training assigned by Franchisor, who has been appointed by you and we have accepted to devote their full time and attention to the operation of the Store, and who has agreed to fulfill and accept this obligation. Notwithstanding this obligation to dedicate their full time and attention to the operation of the Store, we acknowledge that this Owner may serve as the Operating Principal for other Metal Supermarkets stores that you own in addition to the Store. We have the ongoing right to approve or disapprove of the service of the Operating Principal as to the role that he or she plays in your business; if any time we disapprove of such an individual, you agree to remove him/her from the role of Operating Principal, (but you understand and agree that our disapproval of the Operating Principal's service in a particular role is not meant to be, and should not be construed as, any instruction or demand on our part that the individual should be dismissed as an employee and/or as an Owner).

(r)     "<u>Operations Manual</u>" means our confidential operations manual, as we may periodically amend and supplement, which may consist of one or more manuals, containing our mandatory and suggested standards, specifications and operating policies and procedures relating to the development and operation of Metal Supermarkets stores and other information relating to your obligations under this Agreement. We will have the right to provide the Operations Manual in any format we determine is appropriate (including but not limited to paper format and/or by making some or all of the Operations Manual available to you in electronic form, such as through an internet website or the Extranet).

(s)     "<u>Owner</u>" means each person or entity that has a 10% or more direct or indirect legal or beneficial ownership interest in you, if you are a business corporation, partnership, limited liability company or other legal entity.

(t)     "<u>Premises</u>" means the location you select, pursuant to Section 2.2 below, to operate the Store.

(u)     "<u>Property Contract</u>" means a lease, sublease or purchase or similar contract (or any modification thereof) for the Premises.

(v)     "<u>Protected Area</u>" means the geographical area described as the Protected Area in Schedule A.

(w)     "<u>Qualified Affiliate</u>" means an Affiliate of yours: (1) in which you directly or indirectly control or own 50% or more of the equity interest or voting power; (2) which directly or indirectly controls or owns 50% or more of the equity interest or voting power in you; or (3) the principal individual owner (i.e., the person who directly controls or owns 50% or more of the equity interest or voting power) is also the principal individual owner of you (i.e., the person who directly controls you or owns 50% or more of your equity interest or voting power).

(x)     "<u>Store</u>" means the Metal Supermarkets store operated in the physical location specified in Section 2.2 below that you will establish and operate pursuant to this Agreement.

(y)     "System" means the business methods, systems, hardware and software (including the Computer System and Required Software, as those terms are defined below), designs and arrangements for developing and operating Metal Supermarkets stores, including the Marks; the Confidential Information; building design and layout; equipment standards; standards and specifications for metal products and other authorized products and services; training and assistance; inventory ordering and control systems; marketing programs; and certain operations and business standards and policies.

(z)     "Trade Dress" means the distinctive characteristics of a Metal Supermarkets store, including racks, lighting, counter, distinctive paint colors and features, window dressings, posters, signage, décor items, inventory storage methods, and other features for a Metal Supermarkets store we periodically specify in the Operations Manual.

## 2.    GRANT OF RIGHTS.

### 2.1    Grant of Franchise

Subject to the terms of this Agreement, we grant you the right, and you assume the obligation, to operate the Store at the Premises, and to use the System solely in connection therewith, for a term of ten (10) years, starting on the date of this Agreement (the "Term"). You may not conduct the business of your Store or use the System anywhere other than the Premises, or relocate your Store, without our consent.

### 2.2    Selection of Location

(a)     Within a reasonable period of time, not to exceed sixty (60) days after the date of this Agreement, you agree to propose to us a location for your Store within your Protected Area, which location is subject to our approval.

(b)     You agree to submit to us all information about the proposed location that we request, and we have no obligation to consider a proposed location until we receive from you a complete site analysis report for such proposed location. You agree not to execute any lease or purchase agreement for, nor commit to any other binding obligation to purchase or occupy, any proposed location until we have approved the location and the form of lease (and/or sublease) in accordance with the terms of Section 4.1. In determining whether to approve or disapprove any proposed location, we will consider such factors as we deem relevant, including general location, the number of potential customers in its immediate surroundings, and the distance to any other Metal Supermarkets store located outside the Protected Area. We have no liability whatsoever to you or anyone else for approving or disapproving a proposed location. Upon approval of a proposed location, we will identify the location in Schedule B. Upon completion of Schedule B, both parties agree to sign and attach it to this Agreement, and Schedule B shall then be part of this Agreement.

(c)     Neither our site selection requirements, our approval of the Premises, nor any information we may impart to you about the Premises or the Protected Area constitutes a representation, warranty, guarantee or assurance of any kind, express, implied or collateral, that your Store will be profitable or successful. Our approval of the Premises merely signifies that we will permit you to operate your Store at that site. Your decision to develop and operate your Store at the Premises is based solely on your own independent investigation and judgment and not in reliance on any approvals or information from us.

(d)     You agree not to relocate the Store without our prior written consent. Any proposed relocation will be subject to our review of the proposed new site in accordance with 2.2(b) under our then-current standards for site selection, except that we will also have the right to take into consideration

any matters that we may determine to consider. If we approve a relocation of the Store, you agree to pay us a fee of One Thousand and Fifty-Six Dollars ($1,056) (subject to an annual CPI adjustment effective as of our fiscal year end, the base year being our fiscal year end of September 30, 2020), and also reimburse us for the out-of-pocket costs that we incur in connection with reviewing and approving your proposed relocation (including travel and related costs, and our attorneys' fees, if any).

### 2.3    Your Territorial Protection

During the Term, except as otherwise provided in Section 2.4 below, we will not, so long as you are in compliance with the terms of this Agreement:

(a)    operate (directly or through an Affiliate), nor grant to another person the right to operate, any Metal Supermarkets store with a physical location within the Protected Area; or

(b)    establish (directly or through an Affiliate), nor grant to other persons the right to establish, a business within the Protected Area that offers or sells the same range of metal products and metal processing services as are offered by Metal Supermarkets stores generally.

### 2.4    Our Reservation of Rights

Other than the territorial protections we grant to you in Section 2.3 above, we reserve all other rights, and can do anything, anywhere, on any basis we choose, including, without limitation, the following things:

(a)    operate, and grant others the right to operate, Metal Supermarkets stores at any location outside the Protected Area;

(b)    operate, and license others to operate, any business of any kind inside or outside the Protected Area, so long as those businesses (i) are not Metal Supermarkets stores operated within the Protected Area, or (ii) do not sell the same range of metal products and metal processing services as are offered by Metal Supermarkets stores generally;

(c)    acquire (or be acquired) and then operate any business of any kind (including a business selling the same range of metal products and metal processing services as are offered by Metal Supermarkets stores generally), whether located inside or outside the Protected Area; and

(d)    offer, advertise, sell and distribute, or license others to offer, advertise, sell and distribute, directly or indirectly, any products or services using any marks (including the Marks), from any location or to any purchaser (which means we can, among other things, sell products and services at wholesale and to purchasers in the Protected Area through stores, mail order, and on the Internet, under our Marks or as private-labeled items).

### 2.5    Limits on Where You May Sell

You may only offer and sell products and services from the Store, only in accordance with this Agreement and the procedures set forth in the Operations Manuals. You agree not to advertise your Store and not to solicit, offer or sell any products or services through any means other than as permitted in this Agreement; and therefore, for example, you agree not to offer or sell products or services from satellite locations, temporary locations, by use of catalogs, the Internet, or through any other electronic or other media. You agree to exert your best efforts to fully exploit the commercial potential for your Store within the Protected Area and you will not directly or indirectly solicit any customer or prospect (including, for

example, through telemarketing, e-mailing, Internet, SMS (or text) messaging, faxing and other electronic methods, as well as mailer programs and other sales or marketing efforts that we reasonably determine constitutes a solicitation) whose business address (or the location to which you deliver your products or services) is located outside of the Protected Area. We will, in our discretion, exert efforts seeking to restrict Metal Supermarkets stores owned and operated by independent third parties under franchise, license or other arrangements from directly soliciting customers whose principal business address (or the location where products and services are delivered) is located within the Protected Area. You acknowledge and agree that we have no liability for the conduct of a franchisee who does not comply with our requirements or restrictions.

## 3.    FEES.

### 3.1    Initial Franchise Fee

You agree to pay us an initial franchise fee in the amount of Thirty-Nine Thousand Five Hundred Dollars ($39,500). The initial franchise fee is fully earned by us and payable by you upon signing this Agreement and, except as otherwise provided herein, is non-refundable in whole or in part for any reason whatsoever. Any application fee you have paid to us in connection with your application for the rights conferred by this Agreement shall be credited against the initial franchise fee.

### 3.2    Monthly Royalty Fees

(a)    For each of the first twelve months of operation of a newly opened Store, you agree to pay us, on or before the twentieth (20th) day of the next month, a reduced royalty fee based upon your Gross Sales during the immediately preceding full or partial month, as follows:

    i.    For the first twelve months of operation, the royalty fee will be equal to 60% of the royalty fee calculated under Section 3.2(b); and

    ii.    For the purpose of calculating the first 12 months of operation of the Store in this Section 3.2(a) and in Section 3.2(c) below:

        a.    if the Store opens on the 1st through 10th day of a month, then the month in which the Store opens and begins operation shall be deemed the first month of operation; and

        b.    if the Store opens on the 11th day or later of a month, then the next calendar month shall be considered the first month of operation of the Store (even though the royalty fee amount as provided in Section 3.2(a)(i) above is due for the partial month in which the Store opens).

(b)    Except as otherwise provided in Section 3.2(a), you agree to pay us each month, on or before the twentieth (20th) day of that month, a royalty fee based on your Gross Sales during the immediately preceding full or partial month as follows (subject to an annual CPI adjustment effective as of our fiscal year end and the base year being our fiscal year ended September 30, 2020):

    i.    On Gross Sales up to $97,855, a royalty fee of six percent (6%) of such Gross Sales;

    ii.    On Gross Sales from $97,856 to $156,260, a royalty fee of four percent (4%) of such Gross Sales; and

iii.    On Gross Sales from $156,261 or more, a royalty fee of two percent (2%) of such Gross Sales

(c)    Notwithstanding the terms of Section 3.2(b) above, you must pay to us a minimum royalty fee beginning at the start of the first (1st) fiscal year of the Franchisor (i.e. October 1 through September 30) that immediately follows the first (1st) full twelve (12) months of the Store's operations, calculated from the first day the Store opened (regardless of any previous transfers of ownership of the Store or temporary closures). The minimum royalty fee is calculated as the greater of a monthly minimum royalty as set forth below (subject to an annual CPI adjustment effective as of our fiscal year end and the base year being our fiscal year ended September 30, 2020) or the royalty fee as set out under Section 3.2(b):

i.      For the second (2nd) year, a monthly minimum royalty of $1,618;

ii.     For the third (3rd) year, a monthly minimum royalty of $2,103;

iii.    For the fourth (4th) year, a monthly minimum royalty of $2,310;

iv.     For the fifth (5th) year, a monthly minimum royalty of $2,447;

v.      For the sixth (6th) year, a monthly minimum royalty of $2,655;

vi.     For the seventh (7th) year, a monthly minimum royalty of $2,861;

vii.    For the eighth (8th) year, a monthly minimum royalty of $3,104; and

viii.   For the ninth (9th) year or any year thereafter, a monthly minimum royalty of $3,379.

### 3.3    Interest on Late Payments; Late Fees

All amounts which you owe us or any of our Affiliates will bear interest after their due date at the rate of sixteen percent (16%) per annum, not to exceed the highest rate permitted by law. In addition, we have the right to assess service charges for any checks or other payment methods that are returned or otherwise refused for insufficient funds. You agree to pay us a $100 late fee for each payment owed to us under this Agreement which we receive after its due date or for which there are insufficient funds. The late fee is not interest or a penalty. It is used to compensate us for increased administrative and management costs due to late payment. Notwithstanding the foregoing, your failure to pay all amounts when due constitutes grounds for termination of this Agreement as provided in Section 12.

### 3.4    Electronic Transfer of Funds

You agree to sign an electronic transfer of funds authorization in the form attached as Schedule F and/or such other documents as we periodically designate, to authorize and direct your bank or financial institution to transfer either electronically or through some other method of payment designated by us, directly to our account or our Affiliates' account and to charge your account all amounts due to us and our Affiliates from you. Your authorizations must permit us and our Affiliates to designate the amount to be sufficient to allow us and our affiliates to collect the amounts owed to us or our Affiliates when due. You are responsible for any penalties, fines or other similar expenses associated with the transfer of funds. You acknowledge and agree that we have the right to require you to pay either by electronic transfer of funds or through some other method of payment designated by us, regardless of whether we impose the same requirement on other Metal Supermarkets franchisees.

### 3.5 Application of Payments; Offsets

We intend to apply payments made by you first to interest and to the oldest outstanding amounts due to us or our Affiliates regardless of any contrary designation by you. However, we have the right to apply any payments by you to any of your past due indebtedness for the initial franchise fee, royalties, purchases or any other past due indebtedness to us or any of our Affiliates. If we or our Affiliates owe you any money, we have the right to offset amounts owed to us and our Affiliates against what is owed to you. However, you agree that all payments owed by you will be made as and when due without any setoff, deduction or prior demand.

### 3.6 Brand Fund Contribution

(a) We have established a Brand Fund (the "Fund") in accordance with the provisions of Section 7.10, and, subject to any maximum annual contribution levels we establish, you agree to pay us a monthly fee equal to a percent, as determined by us (not to exceed 2.5%), of your Gross Sales to fund the Fund (the "Brand Fund Contribution"). The Brand Fund Contribution is payable on or before the twentieth (20th) day of each month based on your Gross Sales accrued during the immediately preceding month.

(b) Within thirty (30) days of our fiscal year end, we will notify you of any change in the amount of the Brand Fund Contribution for that year. There will be a cap on the maximum amount you are required to contribute as set forth below:

| Brand Fund Contribution | Maximum Annual Contribution |
|---|---|
| 0.5% of Gross Sales | $8,524 |
| 1.0% of Gross Sales | $14,226 |
| 1.5% of Gross Sales | $19,348 |
| 2.0% of Gross Sales | $28,390 |
| 2.5% of Gross Sales | $36,419 |

The Maximum Annual Contribution is subject to annual CPI adjustments effective as of our fiscal year end and the base year being our fiscal year ended September 30, 2020. Effective October 1, 2024, the Maximum Annual Contribution shall no longer be a cap or maximum contribution. As of October 1, 2024, once your Brand Fund Contribution equals the Maximum Annual Contribution, you shall continue to provide a Brand Fund Contribution at fifty percent (50%) of the declared Brand Fund Contribution rate.

(c) If you or a Qualified Affiliate operate other Metal Supermarkets stores pursuant to other franchise agreements with us and such other Metal Supermarkets stores are in contiguous Protected Territories to your Store operated under this Agreement, then your Store under this Agreement, together with your other Metal Supermarkets stores under separate agreements in contiguous Protected Areas, are considered to be "Adjoining Stores."

(d) If you are not in default under this Agreement, any Ancillary Agreements, or any other agreements that you or a Qualified Affiliate has entered into with us, then, with respect only to the Adjoining Stores, the Maximum Annual Contribution described above will be the maximum contribution payable in each year by such Metal Supermarkets store operated by you which generated the greatest Gross Sales in the preceding fiscal year (the "Maximum Contribution Store"), and all other such Metal

Supermarkets stores (which are not the Maximum Contribution Store) shall be required to contribute, as a Brand Fund Contribution, a maximum amount equal to (i) fifty percent (50%) of the Maximum Annual Contribution until September 30, 2024, and (ii) seventy five percent (75%) of the Maximum Annual Contribution beginning October 1, 2024 and thereafter. Further, as of October 1, 2024, as noted under Section 3.6(b), the Maximum Annual Contribution shall no longer be a cap or maximum, and once your Brand Fund Contribution equals the Maximum Annual Contribution, you shall continue to provide a Brand Fund Contribution at fifty percent (50%) of the declared Brand Fund Contribution rate.

### 3.7    Advertising Expenditures

Upon signing this Agreement, you agree to deposit with us Fifteen Thousand Dollars ($15,000) which is the minimum amount you are required to spend on approved advertising during the first twelve (12) months of the operation of your Store. No interest will be accrued or paid on this deposit. During the first twelve (12) months of the operation of your Store, you are required to spend these funds on approved advertising. We have the right, as described in Section 7.8(b) below, to periodically specify expenditures that are permitted to constitute approved advertising. You must make these advertising expenditures in reasonable regular intervals during this 12-month period, and we have the right to make these advertising expenditures on your behalf. You and we will periodically reconcile our expenditures for these purposes, and provide each other with appropriate verification (receipts, etc.) as we specify to substantiate these advertising expenditures.  You authorize us to draw from your advertising deposit for advertising expenditures we make on your behalf and otherwise adjust the balance of that deposit accordingly. Funds from the advertising deposit will also be released to you to reimburse you for the approved advertising expenditures you make during the first twelve (12) months of the operation of your Store.

### 3.8    Conference Fee

(a)    You agree that you (or your Operating Principal) will travel to and attend our annual conference. You agree to pay us a monthly fee as a deposit to cover a portion of your share of the cost of our annual conference. This fee applies whether or not you attend the annual conference and is not refundable except as set forth in this Section. The initial monthly fee will be $92.34 and, within thirty (30) days after our fiscal year end, we will notify you of the monthly fee for our new fiscal year (that is, our fiscal year just started). We have the right to increase the fee by the greater of the change in CPI or five percent (5%) of the previous year's annual conference fee. This fee is due and payable by the twentieth (20th) day of each month and is payable in the same manner as the royalty fee. This fee is a deposit and not your total cost for the annual conference. The final cost of the annual conference may be higher than the aggregate you have contributed and you will pay any additional cost on our request. The payment noted in this Section 3.8(a) is for one individual to attend the annual conference. If you choose to send any other individuals there will be an additional fee, in an amount that we will determine, due to us for each additional individual attending. A Store Manager, or any other employee of yours, may only attend the annual conference when your Operating Principal is also in attendance. If we choose not to have an annual conference in any given year, then no fee will be due. If you have already paid the annual conference fee for such given year, we will refund it to you without interest.

(b)    The annual conference is a vital element in the development and operation of the Metal Supermarkets System and your failure to attend will result in additional costs being incurred by us in communicating relevant information regarding updates to and training on the System. Without prejudice to our other rights under the Agreement, in the event you (or your Operating Principal) fail to attend and participate in the entire annual conference, you agree to pay us a fee in the amount of Two Thousand Eight Hundred Sixty-Two Dollars ($2,862) (subject to an annual CPI adjustment effective as of our fiscal year end and the base year being our fiscal year ended September 30, 2020), which must be paid within thirty (30) days after the end of the annual conference. If you or an Qualified Affiliate operate other Metal

Supermarkets stores pursuant to other franchise agreements with us, you are required to only pay the conference fee in Section 3.8(a) for one (1) Store (or, if applicable, the fee for failure to attend the conference in this Section 3.8(b) for one (1) Store).

### 3.9    Tax Payments

You will pay all state and local franchise, use and similar taxes that may be imposed on us as the result of our receipt or accrual of the Initial Franchise Fee, the Royalty Fee, the Marketing Fees, or other fees that are referenced in this Agreement, whether assessed against you through withholding or other means or whether paid by us directly. In either case, you shall pay us (and to the appropriate governmental authority) such additional amounts as are necessary to provide us, after taking such taxes into account (including any additional taxes imposed on such additional amounts), with the same amounts that we would have received or accrued had such withholding or other payment, whether by you or by us, not been required.

## 4.    DEVELOPMENT OF YOUR STORE.

### 4.1    Purchase or Lease of Premises

(a)    You agree to lease, sublease or purchase the Premises within thirty (30) days after we approve the Premises as set forth in Section 2.2. You agree not to execute a Property Contract without our prior written approval during the term of this Agreement (or after the term of this Agreement as restricted under Section 10.4 below). We must approve in writing the terms of any Property Contract, and you agree to deliver a copy to us for our approval no less than seven (7) days before you sign it. You acknowledge and agree that our approval of the Property Contract for the Premises shall be conditioned upon the execution by you and the landlord of the "Addendum to Lease" (if the Premises is leased or subleased). We will provide the form of Addendum to Lease to you. Notwithstanding the terms of the Property Contract or Addendum to Lease, you acknowledge and agree that we will have the following rights:

   i.    The right to allow us to elect to take an assignment of a leasehold interest upon termination or expiration of your rights under this Agreement, or upon the termination or expiration of your rights under a Property Contract, without the landlord's additional consent, and with an acknowledgment by the landlord that we have no liability or obligation whatsoever under the Property Contract until and unless we assume the Property Contract upon termination or expiration of this Agreement;

   ii.    The right and requirement that the landlord for the Premises provide us with a copy of any notice of default under the Property Contract at the same time as such notice is given to you (as the lessee or sublessee under the Property Contract), and this notice will grant us the right (but not the obligation) to cure any defaults under the Property Contract within the period in which you had to cure any such default should you fail to do so;

   iii.    The right to display and use the Marks in accordance with the specifications required by the Operations Manual, subject only to the provisions of applicable law;

   iv.    The right that the Premises be used solely for the operation of a Metal Supermarkets store;

   v.    The obligation, upon our request, to de-identify the Premises as a Metal Supermarkets store and to promptly remove all Marks, signs, décor, Trade Dress, and other items which we reasonably request be removed as being distinctive and indicative of a Metal Supermarkets store and the System, and the right under the Property Contract to permit us to have

sufficient access to the interior and exterior of the Premises so that we may de-identify the Premises, as provided above, at your cost;

vi.    That any default under a Property Contract shall also constitute a default under this Agreement, and any default under this Agreement shall also constitute a default under a Property Contract; and

vii.    The right to remain in possession of the Premises for at least the Term of this Agreement.

(b)    Our approval of the Property Contract does not constitute a representation, warranty, guarantee or assurance of any kind, express, implied or collateral, as to its fairness or suitability or as to your ability to comply with its terms. We do not, by virtue of approving the Property Contract, assume any liability or responsibility to you or to any third parties. You agree to deliver a copy of the fully signed Property Contract to us within five (5) days after its execution.

(c)    Pursuant to Section 11.3 herein, if you are a corporation, partnership or limited liability corporation or company, you may not own the Premises. Also, neither you nor any Qualified Affiliate may own the Premises without our prior written consent. We may condition our consent of the ownership of the Premises on you or the Qualified Affiliate entering into written agreements with us that shall include provisions that: (a) require that the Premises be used only for the operation of your Store, (b) give us a right to lease the Premises upon commercially reasonable terms upon termination or expiration of this Agreement for a period that is the greater of the balance of the Term or two (2) years, and (c) grant other rights to us necessary to protect our interests.

## 4.2    Development and Opening of Your Store

You agree to open your Store within five (5) months after the date of this Agreement. You are solely responsible for developing your Store and for all expenses associated with it. We will furnish you prototype plans for a Metal Supermarkets store after the Property Contract is signed. You may modify the prototype plans only with our prior written consent, and only to the extent necessary to comply with all applicable laws, regulations, ordinances, building codes and permit requirements and any lease requirements and restrictions. All development must be in accordance with the prototype plans and specifications we have approved and must comply with our Operational Manuals and all applicable laws, regulations, ordinances, building codes and local rules and regulations. We may periodically inspect the Premises during its development. Your Store may not be opened for business until we notify you that all our requirements for opening have been met. You must reimburse us for any costs and expenses we incur prior to the opening of your Store as a result of what we deem to be your lack of organization or planning (for example, if our representative(s) travel(s) to the Store to provide pre-opening assistance and a condition that is within your control or responsibility occurs such that we must return to the Store at a later date, or extend our original visit, following the correction of that condition).

## 4.3    Equipment, Furniture and Signs

(a)    You agree to purchase or lease and use all equipment, communication and computer systems, furnishings, fixtures and signs for your Store of the types, brands and models that we approve for Metal Supermarkets stores as meeting our standards and specifications. You agree to purchase or lease and use approved types, brands or models of equipment, fixtures, furnishings, signs and systems from suppliers specified by us. You agree that we may designate ourselves, an Affiliate or another third party as an exclusive supplier to provide you with particular equipment (including communication systems, computer hardware and software), furnishings, fixtures and signs. We may modify the list of approved types, brands,

models, and/or suppliers and you may not, after receipt of notice of such modification, reorder any type, brand or model from any supplier that is no longer approved.

(b)      If you propose to purchase or lease and use any equipment, fixtures, furnishings or signs of a type, brand or model that we have not previously approved or from a supplier that is not our exclusive supplier, you agree to notify us and submit to us such information as we may request. We have the right to charge reasonable fees to cover our costs for this service.

### 4.4      Telephone, E-Mail and Other Telecommunications Services

(a)      We will obtain, in MSKS's name, the telephone numbers and e-mail addresses for your Store, which you will have the right to use during the Term. We will permit you to use one or more e-mail addresses that we designate (presently, using the "metalsupermarkets.com" domain) during the term of this Agreement for an annual fee that we periodically determine for each e-mail address and its associated security protection (currently $135.00 per e-mail address), and you agree that you will not use (nor permit the use of) any other e-mail addresses in the operation of the Store. You agree to bear all costs associated with your Store's phone system, phone service, telecommunications service, and e-mail service, and other technology, and to reimburse us or our Affiliates for any expenses that we (or they) incur on your behalf (notwithstanding any other agreement with us or with any of our Affiliates). If there are third party vendors that provide some or all of these services, you agree to pay the vendor or us (upon our request) if we have directly paid (or will pay) the provider.

(b)      You acknowledge and agree that all telephone numbers, e-mail addresses, URLs, domain names, social media platforms, and other communication numbers and contact information and directory listings for your Store are MSKS's property, and that MSKS and we have the right to transfer, terminate or amend such properties as either MSKS or we deem appropriate. You agree to execute and deliver to us the Assignment of Telephone Numbers attached to this Agreement as Appendix G-1 and the Assignment of Domain Names, URLs and Email Addresses attached to this Agreement as Appendix G-2. If MSKS or we take any action pursuant to this Section, the third-party provider and all listing agencies may accept this Agreement as conclusive evidence of MSKS or our exclusive rights in such properties, and MSKS's or our authority to direct their amendment, termination or transfer without any liability to you.

### 4.5      Pre-Opening Assistance

If you (or your Operating Principal) have not previously owned or operated a Metal Supermarkets store, we will provide or cause to be provided to you with such pre-opening assistance as we deem appropriate.

### 4.6      Initial Customer List

We will furnish you a database of potential customers located in your Protected Area in order to facilitate initial solicitation of customer orders. You acknowledge and agree that this database and all updates thereto are part of the Customer Information and are MSKS's property. You agree to update, maintain and communicate to us this database and related information on an ongoing basis as we may periodically require.

### 4.7      Customer Information

MSKS owns all Customer Information, including updates and additions made by you, and has granted to us, indirectly, an exclusive license to use and to sublicense the use of such Customer Information. Nothing in this Agreement grants you any ownership interest in or to the Customer Information. You

hereby assign and transfer to us all rights, including intellectual property rights, you may have in and to the Customer Information, and you waive any rights you may have or develop in and to the Customer Information.

## 5.      TRAINING AND GUIDANCE.

### 5.1      Initial Training Program

Prior to our approval of the opening of the Store, you, the Operating Principal, and if applicable, the Manager, must complete or have completed the Initial Training Program to our satisfaction. If your Operating Principal or Manager cease active management or employment at the Store, or if at any time we disapprove of the Operating Principal or Manager (each who may have been previously approved) then a qualified replacement (who must be acceptable to us) must attend and successfully complete our next available Initial Training Program.

We will not charge any fees for attendance of up to three (3) individuals at the Initial Training Program provided in conjunction with the Store opening. Otherwise, you agree to pay us a training fee in the amount of One Thousand Seventy-Eight Dollars ($1,078) (subject to an annual CPI adjustment effective as of our fiscal year end, the base year being our fiscal year ended September 30, 2020) for each individual that will attend the Initial Training Program, with payment to be made in full before training starts. You will be responsible for all expenses (including compensation, travel, meals and lodging) incurred by all individuals you send to the Initial Training Program.

### 5.2      On-Going Guidance

We will furnish you periodic guidance with respect to the System, including improvements and changes to it. Such guidance will be furnished in the form of the Operations Manual, bulletins and other written materials, webinars, consultations by telephone or in person at our offices or at your Store, or by any other means of communication including postings, e-mail and other means, including through our Extranet. We may require you (or your Operating Principal) and or your Manager, to attend and successfully complete periodic or additional training programs (which includes the annual conference) for which we may charge reasonable fees, such as the annual conference as outlined in Section 3.8. If you hire or retain an outside sales representative, he or she may be required to complete the marketing and sales portion of our training program. You acknowledge that: (a) we have the right to charge you fees for any mandatory training programs, regardless of whether you attend or not; and (b) your failure to attend any mandatory training program for any reason whatsoever constitutes an admission that you have received all necessary training, advice and assistance under this Agreement and otherwise to successfully operate your Store. Your, or your Operating Principal's or Manager's, failure to attend or successfully complete any mandatory training program constitutes a breach of this Agreement. The foregoing acknowledgements are not in lieu of any other remedy we may have for your failure to attend any mandatory training programs.

If requested by you, we may provide special assistance for which you will be required to pay the per diem fees and charges we may periodically establish.

### 5.3      Sales and Marketing Assistance

We, including in conjunction with the Fund, may, but are not required to, provide you with sales and marketing assistance as we may deem appropriate, including updating the database of potential customers in the Protected Area and assistance with other sales and marketing programs we or the Fund

may periodically develop. You are responsible for ensuring that you comply with all applicable telemarketing, internet or e-mail, consumer protection, privacy and similar laws or regulations.

### 5.4 Periodic Visits

We will visit your Store, when and as frequently as we deem appropriate, to evaluate and provide advice on your Store's operations and compliance with the System.

### 5.5 Operations Manual

We will provide you access to the Operations Manual. We reserve the right to provide the Operations Manual in hard copy, electronic form or any other form as we may select. At your expense, you will acquire any necessary equipment and technology to receive and use the Operations Manual in its various forms and execute such agreements as may be necessary in connection therewith. You agree to comply with all mandatory standards, specifications and operating procedures and other obligations contained in the Operations Manual. We may modify the Operations Manual to document or reflect changes in standards, specifications and operating procedures and other obligations imposed on you, provided no addition or modification may alter your fundamental status and rights under this Agreement. Mandatory specifications, standards and operating procedures and other obligations we periodically prescribe in the Operations Manual, or otherwise communicate to you in writing, constitute provisions of this Agreement as if fully set forth herein. All references to this Agreement include all such mandatory specifications, standards and operating procedures and other obligations imposed on you. Any required or mandatory standards, specifications, operating procedures and other obligations exist to protect our interests in the System, and not for the purpose of establishing any control or duty or take control over these matters that are reserved to you. You agree that if there is any dispute as to the contents of the Operations Manual, the terms of the master copy of the Operations Manual that we maintain in our home office will be controlling. You agree that at all times, you will treat the Operations Manual, any other manuals that we create (or approve) for use in the operation of the Store, and the information contained in those materials, as Confidential Information, and you also agree to use your best efforts to maintain such information as secret and confidential. You agree that you will never copy, duplicate, record, or otherwise reproduce those materials, in whole or in part, nor will you otherwise make those materials available to any unauthorized person.

## 6.   YOUR ORGANIZATION AND MANAGEMENT

### 6.1 Disclosure of Ownership Interests

You and each of your Owners represents, warrants and agrees that Schedule C is current, complete and accurate. You agree that an updated Schedule C will be furnished promptly to us, so that Schedule C (as so revised and signed by you) is at all times current, complete and accurate. Each person who is an Owner at the time this Agreement is entered into, or who later becomes an Owner as approved pursuant to Section 11 below, must execute an Owner's Personal Guaranty, in the form attached to this Agreement as Schedule D or as we may otherwise designate, undertaking to personally guarantee, and to be personally bound jointly and severally by, the terms of this Agreement. Each Owner must be an individual acting in his personal capacity, unless we waive this requirement in writing.

### 6.2 Management of Store

If you are, or at any time become, a business corporation, partnership, limited liability company or other legal entity, you agree to designate in writing an Operating Principal to operate your Store. You (or your Operating Principal): (a) agree to exert your full-time and best efforts to the operation of your Store

and other Metal Supermarkets stores you operate; and (b) may not engage in any other business or activity, directly or indirectly, that requires substantial management responsibility or time commitments or that otherwise may conflict with your obligations hereunder. We may require you to appoint an employee as Manager of the Store. You agree that your Store shall at all times be managed by you (or your Operating Principal) or a Manager. None of your Owners, the Operating Principal, or Manager may have any direct or indirect ownership interest in a Competitive Business.

## 7.     OPERATING STANDARDS.

### 7.1     Authorized Metals and Other Products and Services

(a)     You agree that your Store will offer for sale the full range of metals and metal services, and such other products and services, that we periodically authorize for Metal Supermarkets stores. You agree to exert your best efforts to market and sell all such products and services and to capitalize on the full potential of your Store in the Protected Area. We have the right to periodically add, modify or delete products and services offered by Metal Supermarkets stores. You acknowledge and agree that additional authorized products and services may require you to incur additional costs for equipment, inventory, additional personnel, personnel training and leasehold improvements.

(b)     If you fail to obtain and sell, or maintain, the range of metals and other products in stock that we periodically require, we may notify you in writing, in which case you agree to obtain and sell, or obtain, sell and maintain in stock, such metals and other products that we periodically require. If you do not do so, we may, at our election, obtain the metals and other products on your behalf. Immediately upon written request by us, you agree to pay all costs of obtaining the full range of inventory for your Store.

(c)     You agree that your Store will not, without our approval, offer any products or services that we have not authorized for Metal Supermarkets stores. Your Store may not be used for any purpose other than the operation of a Metal Supermarkets store in compliance with this Agreement. You agree that your Store will offer courteous, efficient and high-quality services in accordance with our standards.

### 7.2     Purchase of Metals and Other Products

(a)     You acknowledge that the reputation and goodwill of Metal Supermarkets stores is based on the sale of high-quality metals and other products and services. Therefore, you agree that your Store will only sell metals and other products of the type and quality that conform to our specifications and standards and are purchased from suppliers (which may include us and any of our Affiliates) which we approve.

(b)     We may periodically modify our specifications, standards and approved suppliers. After notice of such modification, you may not reorder any metal products or other products that do not meet our then current specifications and standards or reorder any such items from any supplier which is no longer approved.

(c)     If you propose to order any metals or other products of a type or from a supplier, which is not then approved by us, you agree to first submit to us sufficient information, specifications and samples concerning such type of metal or other product or such supplier so that we can decide whether such product or supplier meets our criteria. We have the right to charge reasonable fees to cover our costs. We may prescribe procedures for the submission of requests for approval and impose obligations on suppliers, which we may require to be incorporated in written agreements. We may impose limits on the number of suppliers for any items.

(d)     We have the right to solicit and accept rebates, fees, commissions, discounts or other similar allowances (collectively, "rebates") from any third-party supplier as a result of sales to you or business conducted with you, and may use such rebates as we deem appropriate. Further, we and our Affiliates reserve the right to be an approved supplier, and in some circumstances, the sole approved supplier of various products and services. Anything that you purchase from us or from an Affiliate of ours will be at the then-current price in effect.

(e)     We also have the right to establish preferred vendor and designated supplier programs. You agree to comply with all requirements of any such programs. If we designate suppliers, you will be required to purchase products and / or services from them and enter into such contracts or agreements with them or us as we may require.

### 7.3     Condition of Store

(a)     You agree to maintain the condition and appearance of your Store and any of its motor vehicles so that it is clean and attractive. You agree to repair and maintain your Store's equipment, fixtures, motor vehicles, furnishings, signage, layout and decor as we may reasonably require, including replacing worn-out or obsolete equipment, fixtures, furnishings and signs. If at any time the general state of repair, appearance or cleanliness of your Store or its fixtures, equipment, furnishings, motor vehicles, or signs does not meet our standards, we may notify you and specify the action you must take to correct such deficiency. If, within ten (10) days after receiving such notice, you fail or refuse to initiate and thereafter continue in good faith and with due diligence a bona fide program to complete such required repair or maintenance, we, or our agents, have the right (in addition to our rights under Section 12), but not the obligation, to enter the Premises and perform such repair or maintenance on your behalf and at your expense. You agree to promptly reimburse us for the costs and expenses we and our representative(s) incur in connection with performing such repairs or maintenance.

(b)     You agree to periodically upgrade, remodel, and/or make such modifications, refurbishments, and additions to your Store and motor vehicles as we may reasonably require. You may not make any alterations to your Store, or make any replacements, relocations or alterations of fixtures, equipment, furnishings or signs, without our approval.

### 7.4     Specifications and Standards

(a)     The Operations Manual contains both requirements and recommendations for the operation of a Metal Supermarkets Store. Any mandatory standards exist to protect our interest in the System and the Marks and not for the purpose of establishing any control, or the duty to take control, over those matters that clearly are reserved to you. You agree to comply with all mandatory specifications, standards and operating procedures, as those may be periodically modified (whether contained in the Operations Manual or any other written or electronic communication) relating to the operation of a Metal Supermarkets Store, including (i) authorized products and services offered by your Store and manner in which they are promoted and sold; (ii) sales procedures and services; (iii) marketing and advertising programs (including use of websites and e-mail addresses); (iv) appearance, cleanliness, uniforms and standards of service and operation of your Store; (v) days and hours of operation; (vi) training of your Operating Principal and Manager; and (vii) computer software and record keeping systems including accounting and forms. If you request, and we agree to provide, computer software and record keeping systems support and we determine that such support is necessary because you did not comply with our specifications, standards or procedures, then you agree to pay our then-current computer support fee for those services.

(b)     We may periodically suggest prices at which authorized products and services offered by your Metal Supermarkets Store may be sold or offered for sale. Although you generally have the right to

establish prices for the products and services you sell, we reserve the right to establish and enforce prices, both minimum and maximum, that your Metal Supermarkets Store will sell products and services for, to the extent permitted by applicable law.

### 7.5    Compliance with Laws

You agree to comply with all federal, state, and local laws, rules, and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the business franchised under this Agreement (including, without limitation, licenses to do business and laws relating to handling and storage or products, fictitious name registrations, sales tax permits, and fire clearances). You agree to notify us in writing within five (5) days after: (i) the commencement of any legal or administrative action, or the issuance of any order of any court, agency or other governmental instrumentality that may adversely affect the operation of your Store or your financial condition; or (ii) the delivery of any notice of violation or alleged violation of any law, ordinance or regulation. You agree to adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct in all dealings with us, as well as your customers, suppliers, landlords, lessors and the public.

### 7.6    Personnel

(a)    You agree that your Store will at all times be staffed by a sufficient number of competent and trained employees who are periodically trained to meet our brand standards. You will always be solely responsible for (and exclusive control over) all employment decisions for your Store, including those related to hiring, firing, remuneration, personnel policies, benefits, record keeping, supervision and discipline, and regardless of whether you received advice from us on these subjects.

(b)    You and your staff (including the Operating Principal) agree that you will, at all times, work cooperatively and professionally with us and with our representatives, and will develop, cultivate, and at all times maintain a cooperative, cordial, respectful, and professional work environment for your staff and among all of the Owners of the Store.

### 7.7    Insurance

(a)    You agree to purchase and maintain in force at your sole expense and from a company we approve insurance that insures both you and us and our Affiliates and any other persons or entities we designate by name. The insurance policies must include, at a minimum:

(i)    commercial general liability insurance covering claims for personal injuries and property damage with minimum limits of $1,000,000 per occurrence, $2,000,000 general aggregate, $2,000,000 products/completed operations aggregate, and $1,000,000 for Errors and Omissions;

(ii)    employer's liability insurance with minimum limits of $1,000,000 for bodily injury caused by accident or disease, or the minimum required by state law (whichever is greater);

(iii)    vehicle liability for owner, leased, hired and non-owned vehicles with minimum limits of $1,000,000 combined single limit for bodily injury and property damage per occurrence;

(iv)    umbrella liability insurance with minimum limits of $1,000,000;

(v)    worker's compensation insurance;

(vi)     any other such insurance coverages or amounts as required by law or agreement related to your Store; and

(vii)     any other insurance or increases in limits to the foregoing as we may periodically require, or provide in the Operations Manual.

(b)     All liability insurance policies must name us and our Affiliates, and each of our and their officers, directors and employees as additional insureds, must provide that such insurance is primary insurance with respect to the interests of all additionally named insureds, and must provide that any other insurance maintained by us or by you or any subcontractor is excess and not contributing insurance with the insurance required under this Agreement. The policy must contain a waiver by the insurance carrier of all subrogation rights against us.

(c)     You agree to deliver to us at commencement and annually or at our request a proper certificate evidencing the existence of such insurance coverage and your compliance with the provisions of this subparagraph. The insurance certificate must show our status as an additional insured (as noted above) and provide that we will be given thirty (30) days' prior written notice of material change in or termination or cancellation of the policy. We also may request copies of all policies. We may periodically modify, upon written notice to you, the required minimum limits and by written notice to you, as conditions require, to reflect changes in relevant circumstances, industry standards, experiences in the Metal Supermarkets System, standards of liability and higher damage awards. In the event of such notification, you agree to immediately cause the modification of the policy, and evidence thereof, in accordance with our request. If at any time you do not procure or maintain the insurance coverage required by this Agreement, we have the right, but not the obligation, to procure insurance coverage and to charge the same to you, together with a reasonable fee for the expenses we incur in doing so, payable by you immediately upon notice. We also have the right to terminate this Agreement for cause should you fail to comply with this provision.

### 7.8     Advertising

(a)     After the first twelve (12) months of operation of your Store, during each year co-terminus with our fiscal year, you agree to spend on approved advertising programs (as noted in Section 7.8(b)), at a minimum, the greater of $10,000 or 1.0% of Gross Sales accrued during such period (and for the period between the end of your first twelve (12) months of operations and the start of our then next fiscal year, the $10,000 annual minimum requirement will be pro-rated). You must deliver to us documentation of your advertising expenditures at such times and in such form as we periodically designate. If you fail to make any required advertising expenditures, we have the right to require you to contribute the amount of any deficiency to the Fund to be used in accordance with Section 7.10.

(b)     We have the right to periodically designate in our Operations Manual the expenditures that will or will not be permitted to constitute approved advertising, but advertising programs that we may approve include: (a) any amounts spent for advertising media; and (b) the cost of producing approved materials necessary to participate in these media, if not provided by us. Advertising expenditures will not be approved for items which we, in our reasonable judgment, deem inappropriate for meeting this minimum advertising requirement, including permanent on-premises signs, maintaining vehicles (even though such vehicles may display the Marks). You agree to use such advertising, media placement and public relations agencies as we may periodically designate. For local or regional advertising whose scope includes more than one Metal Supermarkets store, the advertising must identify each applicable Metal Supermarkets store, and the cost of such advertising shall be reasonably apportioned among all Metal Supermarkets stores listed in that advertisement.

(c)      All of your advertising must be in such media and of such type and format as we may approve, must be conducted in a dignified manner and must conform to our social media policy and such standards and requirements as we periodically specify. You agree to submit to us for our prior approval, samples of all advertising and promotional materials not prepared or currently approved by us and which vary from our standard advertising and promotional materials. You must reimburse us for the costs and expenses we incur in connection with the review and approval of any unapproved advertising materials, including any changes or revisions we make in connection with such materials. All of your advertising and promotion must comply with all applicable laws, be completely factual and conform to the highest standards of ethical advertising. In addition to any other provision of this Agreement, you will be solely responsible for compliance with any laws pertaining to sending e-mails and other electronic messages, including but not limited to the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (known as the **"CAN-SPAM Act of 2003"**) the California Consumer Privacy Act, and the Canada Anti-Spam Law that came into force as of July 1, 2014 (**"CASL"**). You agree to refrain from any business or advertising practice that may, in our opinion, be injurious to our business, to the business of other Metal Supermarkets stores or to the goodwill associated with the Marks or System.

### 7.9     Online Sites

(a)      You agree not to advertise your Store or to offer or sell any products or services of your Store through Online Sites or any other medium we periodically determine to be inappropriate.

(b)      Unless we have otherwise approved in writing, you agree to neither establish nor permit any other party to establish an Online Site relating in any manner whatsoever to the Store or referring to the Marks. We will have the right, but not the obligation, to provide one or more references or webpage(s), as we may periodically designate, within our Online Site. However, if we give you our prior written consent to have a separate Online Site (which we are not obligated to approve), then each of the following provisions shall apply:

(i)      You agree to not establish or use any Online Site without our prior approval.

(ii)      Any Online site owned or maintained by or for your benefit will be deemed "advertising" under this Agreement, and will be subject to (among other things) our approval under Section 7.8 above.

(iii)      Before establishing any Online Site, you agree to submit to us, for our prior approval, a sample of the proposed Online Site domain name, format, visible content (including, without limitation, proposed screen shots, links, and other content), and non-visible content (including, without limitation, meta tags, cookies, and other electronic tags) in the form and manner we may reasonably require.

(iv)      You may not use or modify such Online Site without our prior approval as to such proposed use or modification.

(v)      In addition to any other applicable requirements, you agree to comply with the standards and specifications for Online Sites that we may periodically prescribe in the Operations Manual or otherwise in writing (including, but not limited to, requirements pertaining to designating us as the sole administrator or co administrator of the Online Site).

(vi)      If we require, you agree to establish such hyperlinks to our Online Site and others as we may request in writing.

(vii)     If we require you to do so, you agree to make weekly or other periodic updates to our Online Site to reflect information regarding specials and other promotions at your Store.

(viii)     We may require you to make us the sole administrator (or co-administrator) of any social networking pages that you maintain or that are maintained on your behalf, and we will have the right (but not the obligation) to exercise all of the rights and privileges that an administrator may exercise.

### 7.10     Brand Fund

(a)     We have established and administer the Fund for the creation, development, placement and management of marketing, advertising and related programs and materials.  We have sole determination over all aspects of all programs financed by the Fund, including international, national and/or regional media, creative concepts, materials and endorsements.  Although the Fund is intended to maximize general recognition and patronage of the Marks for the benefit of all Metal Supermarkets stores, we cannot assure you that any particular Metal Supermarkets store will benefit directly or pro rata from the placement of advertising or that expenditures from the Fund will be made in the United States or in the Protected Area.  The Fund may be used to pay for the cost of preparing, producing, management and placement of materials and programs we select, including video, audio, written, Internet and other electronic media, and for the cost of engaging advertising, creative and technical agencies, consultants or talent as well as supporting market and customer research, measurement and analysis activities.  We may furnish you with marketing, advertising and promotional materials at cost, plus any related administrative, shipping, handling and storage charges.

(b)     Brand Fund Contributions payable pursuant to Section 3.6 will be deposited in the Fund.  We agree that all Metal Supermarkets stores located in the United States that we own will contribute to the Fund on the same basis as you are required to under this Agreement.  The Fund will be accounted for separately from our other funds, but may be deposited in any of our general accounts and commingled with our other funds and funds of our Affiliates.  The Fund may be used to pay for reasonable salaries, benefits, administrative costs and overhead which we or our Affiliates may incur or which are allocated to activities related to the administration or management of the Fund and its programs, including conducting market and customer research, preparing advertising and marketing materials and collecting and accounting for contributions to the Fund.  All disbursements from the Fund will be made first from income and then from contributions.  We have the right to spend an amount greater or lesser than the amount of the Fund Contributions in any year.  The Fund may borrow from us or others to cover deficits in the Fund or cause the Fund to apply any surplus for future use by the Fund.  We will internally prepare annually a statement of monies collected and costs incurred by the Fund and furnish you with a copy upon your written request.  Except as otherwise expressly provided in this Section 7.10, we assume no direct or indirect liability or obligation with respect to the maintenance, direction or administration of the Fund.  The Fund is not a trust fund, an escrow fund or a separate bank account and we do not act as trustee or in any other fiduciary capacity with respect to the Fund.

(c)     You acknowledge and agree that we and/or our Affiliates may maintain other marketing and/or advertising funds in other regions or countries and that certain costs and/or expenses relating thereto may be shared among the various funds, including the Fund.  We and/or our Affiliates, have the right to co-mingle or separate such funds or combine administrative functions of such funds, including the Fund, to create one or more funds for Canada and/or the United States and/or to allocate all or a portion of such funds, including the Fund, to regional, national or international advertising and marketing administered by us, or to co-operatives administered by one or more groups of franchisees on a basis that we determine.

### 7.11   Payment of Taxes

You agree to promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, and all accounts and other indebtedness of every kind that you incur in the conduct of the business franchised under this Agreement.

### 7.12   Payment of Trade Creditors

You agree to promptly pay when due all trade creditors and vendors (including but not limited to any that are affiliated with us) that supply goods or services to you or the business you operate pursuant to this Agreement. You also agree to promptly pay us for any expenditures or payments we choose (or are required) to make to trade creditors or vendors on your behalf to pay for obligations that you incurred in connection with the operation of your Store (for example, products and/or services that you ordered but did not pay for). We may share credit information with our Affiliates, and each of our Affiliates have the right to use this information in order to determine how much, if any, credit to provide to you.

### 7.13   Your Right to Contest Liabilities

If there is a bona fide dispute as to your liability for taxes assessed or other indebtedness, you may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event will you permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Franchised Business, or any improvements thereon.

### 7.14   E-Commerce

You agree to participate in our E-Commerce program as it exists from time to time and you will execute an E-Commerce Participation Agreement in the form and manner that we periodically designate. You acknowledge and agree that we or our Affiliate will own and control the Metal Supermarkets E-Commerce website. You agree to abide by such reasonable requirements and restrictions, including the payment of fees, relating to the E-Commerce program as we may periodically impose.

### 7.15   Association with Causes

You acknowledge and agree that certain associations between you or the Store or the Proprietary Marks or the System, on the one hand, and certain charitable, political, religious, cultural, special interest, or other types of groups, organizations, causes, or activities, on the other, however well-intentioned and legal, may create an unwelcome, unfair, or unpopular association with, or an adverse effect on, our reputation or the goodwill associated with the Proprietary Marks. Accordingly, you agree that you will not, without our prior written consent, take any actions that are, or which may be perceived by the public to be, taken in the name of, in connection or association with you, the Proprietary Marks, the Store, us, or the System involving either (i) the donation of any money, products, services, goods, or other items to, or (ii) the promotion of any charitable, political, religious, cultural, special interest, or other type of organization, group, or activity.

## 8.   REPORTS AND INSPECTIONS.

### 8.1   Records

You agree to prepare and to maintain for eight (8) years, not including your last filed state and federal income tax return, complete and accurate books, records (including invoices and records relating to

your Gross Sales) and accounts (using our standard chart of accounts, the Computer System and the Required Software (as those terms are defined below)) for your Store, copies of your sales tax returns and such portions of your state and federal income tax returns as relate to your Store. All such books and records must be kept at the Premises, unless we otherwise approve.

**8.2    Computer System**

(a)     We have the right to specify or require certain brands, types, makes, and/or models of communications, computer systems, and hardware to be used by, between, or among Metal Supermarkets stores, and in accordance with our standards, including without limitation: (a) back office systems, data, audio, video (including managed video security surveillance), telephone, VoIP, voice messaging, retrieval, and transmission systems for use at Metal Supermarkets stores, between or among Metal Supermarkets stores, and between and among the Store, and you, and us; (b) physical, electronic, and other security systems and measures; (c) printers and other peripheral devices; (d) archival back-up systems; and (e) internet access mode (e.g., form of telecommunications connection) and speed (collectively, all of the above are referred to as the "Computer System").

(b)     We will have the right, but not the obligation, to develop or have developed for us, or to designate: (a) computer software programs and accounting system software that you must use in connection with the Computer System ("Required Software"), which you must install; (b) updates, supplements, modifications, or enhancements to the Required Software, which you must install; (c) the tangible media upon which you must record data; and (d) the database file structure of your Computer System. If we require you to use any of the above items, then you agree that you will do so. You agree to enter into such agreements as we may periodically require in connection with your implementation and use of the Computer System and Required Software (currently, this includes the Hosting Support and Software License Agreement and VoIP Services Agreement).

(c)     You agree to implement and periodically make upgrades and other changes at your expense to the Computer System and Required Software as we may direct (collectively, "Computer Upgrades"). You agree to comply with all specifications and changes that we issue with respect to the Computer System, the Required Software and Computer Upgrades, at your expense. You agree to also afford us unimpeded access to your Computer System and Required Software, including all information and data maintained thereon, in the manner, form, and at the times that we request.

(d)     You agree that all data that you collect, create, provide, or otherwise develop on your Computer System (whether or not uploaded to our system from your system and/or downloaded from your system to our system) is also Confidential Information and will be owned exclusively by us or our Affiliate (except for customer's payment details), and that we will have the right to access, download, and use that data in any manner that we deem appropriate without compensation to you. You agree that all other data that you create or collect in connection with the System, and in connection with your operation of the Store (including customer and transaction data, but excluding customer's payment details), is and will be owned exclusively by us or our Affiliate s during the term of, and after termination or expiration of, this Agreement.

(e)     In order to operate your Store under this Agreement, we license use of such data back to you, at no additional cost, solely for the term of this Agreement and for your use in connection with operating the Store. You acknowledge and agree that except for the right to use the data under this clause, you will not develop or have any ownership rights in or to the data. You agree to transfer to us all data (in the digital machine-readable format that we specify, and/or printed copies, and/or originals) promptly upon our request when made, whether periodically during the term of this Agreement, upon termination and/or expiration of this Agreement, any transfer of an interest in you, and/or a transfer of the Store.

### 8.3 Periodic Reports

You agree that for purposes of determination of your Store's Gross Sales we can utilize the information located on the Required Software used in connection with your Computer System. You will inform us of any errors related to Gross Sales for a given month by the fifth (5th) day of the following month. You agree to report your Store's Gross Sales by the fifth (5th) day of the following month if the Required Software fails to do so for any reason whatsoever. You agree to furnish us: (a) no later than the twentieth (20th) day of each month, an income statement for your Store for the preceding month (subject to your compliance with all relevant privacy laws relating to the retrieval, use, storage and transmission of personal information of customers) and for the year-to-date and the identity and contact information of each customer of your Store during the preceding month; (b) within ninety (90) days after the end of each fiscal year, a year-end balance sheet and income statement and statement of cash flow of your Store for such year, reflecting all year-end adjustments and accruals; and (c) such other information as we may periodically require, including reports on sales and marketing activities, inventory purchase reports, sales and income tax statements and personal financial statements of your Owners. You agree to verify that the information in each such report and financial statement is complete and accurate and, in the case of financial statements, that they are prepared consistently and in compliance with applicable generally accepted accounting principles, and to acknowledge in writing that such information is complete and accurate. We have the right to use or disclose information from such reports and statements as we deem appropriate. We reserve the right to require that your annual financial statements be audited, at your expense, by an independent certified public accountant.

### 8.4 Inspections; Other Store Visits

We and our agents have the right at any time during business hours and without notice to: (a) inspect your Store and make purchases; (b) observe, record, photograph, audio-tape and/or video tape the operations of your Store; and (c) interview personnel and customers of your Store. You agree to cooperate fully with such activities.

You will permit us or our authorized representative to enter your Store during normal business hours, and extend reasonable cooperation to us or them, for the purpose of ensuring compliance relative to this Agreement, the Operations Manual, and otherwise, touring potential or existing franchisees or their employees, or conducting on-site training or testing of new policies, procedures, technologies, products or services.

### 8.5 Audits

(a)     We have the right at any time during business hours, and without notice to you, to inspect, copy and audit the books, records, tax returns and documents relating to the development, ownership, lease, occupancy or operation of your Store.   You agree to cooperate fully with our representatives and independent accountants conducting such audits.  If any audit discloses an understatement of Gross Sales, we agree to provide you with a copy of the audit report, and you will pay us, within seven (7) days after receipt of such audit report, the royalties due on the amount of such understatement, plus interest and fees (as provided in Section 3.3) from the date originally due until the date of payment.

(b)     In addition, you agree to pay us the costs of any audits performed (plus an administrative fee of $3,500 to cover our administrative expenses) as a result of: (a) your failure to submit any reports or materials required by Section 8.3; (b) your failure to maintain and provide us access to books and records (whether in hard copy or electronic form) as required by Sections 8.1 and 8.2; (c) your reporting of Gross Sales for any month that are more than two percent (2%) below your actual Gross Sales for such month, as determined by any such audit; and/or (d) your failure to produce all of your books and records as required

by us or our authorized agents within ten (10) days after we request any such items. Such audit costs include the fees and costs of any independent accountants, travel and related expenses incurred by our employees and a reasonable allocation of compensation and related costs for time expended by our employees in connection with such audit as we determine.

(c)      You hereby authorize us to contact customers of your Store, and your vendors, suppliers, lenders, financial institutions and landlord to obtain information related to the operation of your Store and your compliance with the terms of this Agreement, and you waive any expectations of confidentiality or privacy with respect to us obtaining such information.

### 8.6      Privacy

We may periodically specify in the Manual or otherwise in writing the information that you agree to collect and maintain on the Computer System installed at the Store, and you agree to provide to us such reports as we may reasonably request from the data so collected and maintained. All data pertaining to or derived from the Store (including, without limitation, data pertaining to or otherwise about Store customers, but excluding customer payment card information) is also Confidential Information and shall be our exclusive property, and we grant a royalty-free non-exclusive license to you to use such data during the term of this Agreement.

a)      You agree to abide by all applicable laws pertaining to the privacy of consumer, employee, and transactional information ("Privacy Laws").

b)      You agree to comply with our standards and policies pertaining to the privacy of consumer, employee, and transactional information. If there is a conflict between our standards and policies and Privacy Laws, you agree to: (a) comply with the requirements of Privacy Laws; (b) immediately give us written notice of such conflict; and (c) promptly and fully cooperate with us and our counsel in determining the most effective way, if any, to meet our standards and policies pertaining to privacy within the bounds of Privacy Laws.

c)      You agree to not publish, disseminate, implement, revise, or rescind a data privacy policy without our prior written consent as to such policy.

### 8.7      Credit Cards and PCI Compliance

With respect to your acceptance and processing of customer payments by credit and debit cards, you agree to do all of the following:

(a)      You agree to maintain, at all times, credit-card relationships with the credit- and debit-card issuers or sponsors, check or credit verification services, financial-center services, merchant service providers, and electronic-fund-transfer systems (together, "Credit Card Vendors") that we may periodically designate as mandatory.

(b)      You agree not to use any Credit Card Vendor for which we have not given you our prior approval or as to which we have revoked our earlier approval.

(c)      We have the right to modify our requirements and designate additional approved or required methods of payment and vendors for processing such payments, and to revoke our approval of any service provider.

(d)      You agree to comply with all of our policies and requirements regarding acceptance and use of payment by credit and/or debit cards and data collection and protection.

(e)     You agree to comply with the then-current Payment Card Industry Data Security Standards as those standards may be revised and modified by the PCI Security Standards Council, LLC (see www.pcisecuritystandards.org), or any successor organization or standards that we may reasonably specify. Among other things, you agree to implement the enhancements, security requirements, and other standards that the PCI Security Standards Council (or its successor) requires of a merchant that accepts payment by credit and/or debit cards.

### 8.8     Extranet

We may establish an Extranet (but are not required to do so or to maintain an Extranet). If we establish an Extranet, then you agree to comply with our requirements (as set forth in the Operations Manual or otherwise in writing) with respect to connecting to the Extranet, and utilizing the Extranet in connection with the operation of your Store. The Extranet may include, without limitation, the Operations Manual, training and other assistance materials, and management reporting solutions (both upstream and downstream, as we may direct). You agree to purchase and maintain such computer software and hardware (including but not limited to telecommunications capacity) as may be required to connect to and utilize the Extranet. You agree to execute and deliver to us such documents as we may deem reasonably necessary to permit you to access the Extranet.

## 9.     TRADEMARKS

### 9.1     Ownership of the Marks

You acknowledge that the Marks are valid and that MSKS owns the Marks as of the date of this Agreement. Your right to use the Marks is derived solely from this Agreement and is limited to conducting business pursuant to and in compliance with this Agreement. Your unauthorized use of any of the Marks constitutes a breach of this Agreement and an infringement of MSKS's, MSSC's and our rights to the Marks. This Agreement does not confer on you any goodwill or other interests in the Marks. Your use of the Marks and any goodwill established thereby inures to the exclusive benefit of us, MSKS, MSSC and our other Affiliates. All provisions of this Agreement applicable to the Marks apply to any additional or substitute trademarks and service marks we authorize you to use. You may not at any time during or after the Term contest, or assist any other person in contesting, the validity or ownership of any of the Marks.

### 9.2     Use of the Marks

(a)     You agree to use the Marks as the sole identification of your Store. You agree to identify yourself as the independent owner in the following manner or in any other manner we prescribe in writing:

> "This store is operated by an independent franchisee of Metal Supermarkets Franchising America Inc. The METAL SUPERMARKETS trademarks used by the franchisee are owned and licensed to the franchisee by MSKS IP Inc."

We have the right to require different or additional such notices in your Store (both in the customer-facing areas as well as in the back areas).

(b)     You agree to use the Marks as we prescribe in connection with the sale of authorized products and services and in a manner which conforms in nature and quality to the specifications, standards, and procedures that we periodically prescribe and communicate to you. You may not use any Mark (or any abbreviation, modification, confusingly similar variation, or colorable imitation) as part of any corporate or legal business name or in any other manner not expressly authorized by us in writing. You agree to hold yourself out to the public as an independent contractor operating the Store pursuant to a license from us.

You agree to display a sign in a prominent place on your Store premises indicating that your Store is independently owned by you. You agree to clearly indicate on your business checks, stationery, purchase orders, receipts, and other written materials that you are the owner of your Store and that you are a Metal Supermarkets franchisee. You may use the Marks on various materials, such as business cards, stationery, purchase orders and checks, provided you: (i) accurately depict the Marks on the materials; (ii) include a statement on the materials indicating that you independently own and operate your Store; and (iii) do not use the Marks in connection with any other trademarks, trade names or service marks unless we specifically approve it in writing prior to the use.

(c)     You agree to permit us, our Affiliates and our authorized representatives, at all reasonable times, to enter the Premises for the purpose of inspecting your products and services and the sale, advertisement or performance of your products and services, and any relevant documents, materials and records, in order to determine that you are complying with this Section 9.2.

(d)     You agree that you will not, either during or after the term of this Agreement, use any of the Marks or any similar word, phrase or symbol: (i) as part of any domain name or electronic address you maintain on the internet, the World Wide Web, or any other similar proprietary or common carrier electronic delivery system; or (ii) in any user name, screen name or profile in connection with any Online Site, except in accordance with our guidelines periodically set forth in the Operations Manual or otherwise in writing. We reserve the right to require our approval of any message you compose for an Online Site or commentary for any other website before you post such message or commentary.

(e)     You agree that you will not, under any circumstances, use the Marks in connection with (and/or on) any HR-related document (including but not limited to employment applications, employment agreements, paychecks, pay stubs, employee handbooks, and/or otherwise in connection with labor or other employee-relations matters).

**9.3     Discontinuance of Use of Marks**

If we determine it is advisable at any time for us and/or you to modify or discontinue use of any Mark and/or use one or more additional or substitute trademarks or service marks, you agree to comply with our directions within a reasonable time after notice. We will have no liability or obligation whatsoever with respect to any such required modification or discontinuance of any Mark or the promotion of a substitute trademark or service mark.

**9.4     Infringements and Claims**

(a)     You agree to promptly notify us of any suspected infringement of the Marks, any known challenge to the validity of any Mark, or any known challenge to our ownership of, or your right to use, the Marks licensed under this Agreement. You acknowledge that we and MSKS have the right to direct and control any administrative proceeding or litigation, or other adjudicative proceeding involving the Marks, including any settlement thereof. We have the right, but not the obligation, to take action against use by others that may constitute infringement of the Marks.

(b)     If you have used the Marks in accordance with this Agreement, then we will defend you at our expense against any third-party claim, suit, or demand involving the Marks arising out of your use thereof, provided you have timely notified us of such claim and provided further that you and your Owners are in compliance with this Agreement and all other agreements entered into with us or any of our Affiliates. If you have used the Marks but not in accordance with this Agreement, then we, MSKS or MSSC will have the right to defend you (but at your expense), or settle the matter at our discretion, against such third-party claims, suits, or demands. To the extent that such dispute (whether in litigation or otherwise) is the result

of your use of the Marks in a manner inconsistent with the terms of this Agreement, then you agree to reimburse us for the cost of such litigation or dispute (or, upon our written request, pay our legal fees directly), including without limitation reasonable attorneys' fees, court costs, discovery costs, and all other related expenses, as well as the cost of any judgment or settlement. MSKS, MSSC or we are entitled to prosecute, defend and/or settle any action arising out of your use of any Mark, and if MSKS, MSSC or we undertake to prosecute, defend and/or settle any such matter, we will have no obligation to indemnify or reimburse you for any fees or disbursements of any legal counsel retained by you.

(c)     If we undertake the defense or prosecution of any litigation or other similar proceeding relating to the Marks, you agree to sign any and all documents, and do those acts and things that may, in our counsel's opinion, be necessary to carry out the defense or prosecution of that matter (including but not limited to becoming a nominal party to any legal action).

## 10.    RESTRICTIVE COVENANTS.

### 10.1    Confidential Information

(a)     You shall not, during the term of this Agreement or at any time thereafter, communicate, divulge, or use for the benefit of any other person, persons, partnership, entity, association, or corporation any Confidential Information that may be communicated to you, of which you may be apprised, and/or that you may have learned by virtue of your operation of the Store. You may divulge our Confidential Information only to those of your employees as must have access to it in order to operate the Store.

(b)     Any and all information, knowledge, know how, and techniques that we designate as confidential shall be deemed Confidential Information, except information that you can demonstrate came to your attention before disclosure of that information by us; or which, at or after the time of our disclosure to you, had become or later becomes a part of the public domain, through publication or communication by others.

(c)     You acknowledge that any failure to comply with the requirements of this Section 10.1 will cause us irreparable injury, and you agree to pay all costs (including, without limitation, reasonable attorneys' fees, court costs, discovery costs, and all other related expenses) that we incur in obtaining specific performance of, or an injunction against violation of, the requirements of this Section 10.1.

### 10.2    In-Term Covenants

During the Term, you shall not:

(a)     directly or indirectly own any legal or beneficial interest in, or render services or give advice to: (1) any Competitive Business located anywhere; or (2) any entity located anywhere which grants franchises, licenses or otherwise grants similar rights to others to operate any Competitive Business;

(b)     directly or indirectly divert or attempt to divert or assist or cooperate in the diversion of any customer, potential customer or prospect of any Metal Supermarkets store to any competitor or do anything injurious or prejudicial to the goodwill associated with the Marks or the System; or

(c)     directly or indirectly divert or attempt to divert or assist or cooperate in the diversion of any business or customer from your Store to any Competitive Business.

### 10.3  Information Exchange

You acknowledge and agree that the value of the System is maximized by our evaluating and, if we deem appropriate, incorporating into the System innovations suggested, developed or employed by franchisees of Metal Supermarkets stores. If such innovations from other Metal Supermarkets store franchisees are incorporated in the System, you will be entitled to use them as part of the System licensed hereunder. You acknowledge and agree that you have a reciprocal obligation to us hereunder and therefore agree to disclose to us, and that we will subsequently own, all ideas, concepts, methods, techniques and products relating to the development, marketing and/or operation of a Metal Supermarkets store that you conceive, employ or develop. If we or MSKS adopt any of them as part of the System, they will be deemed MSKS's sole and exclusive property, or, at MSKS's determination, our sole and exclusive property, as if they had been conceived or developed by you under a Contract of Service with MSKS, or us, as applicable and deemed to be works made-for-hire for MSKS. You agree to execute assignments and other documents we require to evidence our or MSKS's ownership, as applicable, and to assist MSKS and us in securing intellectual property rights in such ideas, concepts, methods, techniques or products. You agree to ensure that any person who wholly or partially assisted in the creation and development of such ideas, concepts, methods, techniques or products executes a waiver of his or her rights.

### 10.4  Post-Term Covenants

(a)     For a period of two (2) years, starting on the effective date of termination or expiration (without grant of a successor franchise) of this Agreement, and/or a Transfer as contemplated in Section 11 below, you shall not:

i.     directly or indirectly own a legal or beneficial interest in, or render services or give advice to, any Competitive Business operating at: (A) the Premises; (B) within the Protected Area; (C) which operates within a fifteen (15) mile radius from the Premises; and/or (D) within a ten (10) mile radius of any other Metal Supermarkets store;

ii.     take any action that could reasonably be considered to directly or indirectly solicit (e.g., through telemarketing, e-mailing, faxing, mailer program, Internet or mobile application and/or any other marketing efforts that we reasonably determine to constitute a solicitation) any former, current or prospective customer of your Store; and/or

iii.     directly or indirectly own a legal or beneficial interest in, or render services or give advice to any entity which grants franchises, licenses or other interests to others to operate any Competitive Business.

(b)     You acknowledge that your Store will benefit materially from the use of the System, that we have a legally protectable interest in the System and that the foregoing covenants are reasonable and necessary elements to the protection of the System and therefore are an integral part of this Agreement. You also acknowledge that you possess skills and abilities of a general nature and have the opportunity for exploiting such skills in other ways, so that enforcement of the covenants made in this Section will not deprive any of you of your personal goodwill or ability to earn a living.

(c)     If, at any time during the two-year period following expiration or termination of this Agreement, and/or a transfer as contemplated in Section 11 below, you do not comply with your obligations under this Section 10.4 or 10.5 below, then you agree that the time during which you are not complying with these obligations will be added to the end of the two-year period to ensure a full two years of compliance with these obligations in every circumstance.

(d)     The restrictions in Section 10.2 and this Section 10.4 shall not apply to: (A) the ownership or operation of other Metal Supermarkets stores that are licensed or franchised by us or any of our Affiliates; or (B) the ownership of shares of a class of securities that are listed on a stock exchange or traded on the over-the-counter market and that represent less than five percent (5%) of that class of securities.

### 10.5     Non-Solicitation

For a period of two (2) years, starting on the effective date of termination or expiration (without grant of a successor franchise) of this Agreement (as well as any termination pursuant to a transfer as contemplated under this Agreement), you agree that you will not, directly or indirectly, solicit any former, current, and/or prospective customers or vendors of your Store.

### 10.6     Personal Covenants

You agree to require and obtain execution of covenants similar to those set forth in this Section 10 (as modified to apply to an individual), from your Operating Principal and Manager. The covenants required by this section shall be in the form that we prescribe and must, among other things, designate us as a third-party beneficiary of such covenants with the independent right to enforce them.

## 11.     TRANSFER OF AGREEMENT.

### 11.1     Transfer by You Subject to Our Approval

(a)     You and/or your Owners may effect a Transfer of the Franchise (as defined below) subject to our approval and subject to you complying with all the applicable provisions of this Section 11. You agree to submit to us all information we require in order to determine whether to approve a proposed Transfer of the Franchise, and we agree to notify you of our approval or disapproval within a reasonable period of time, not to exceed thirty (30) days, after we have received all requested information relating to the proposed Transfer of the Franchise.

(b)     As used in this Agreement and as always subject to the approval of the Franchisor, "Transfer of the Franchise" means the voluntary or involuntary, direct or indirect, sale, assignment, transfer, pledge, grant of a security interest in, and/or any other disposition of: (1) this Agreement; (2) any right or obligation under this Agreement; (3) any ownership interest in Franchisee; and/or (4) the assets, revenues, and/or income of your Store. The term Transfer of the Franchise includes: (1) any issuance or redemption of a legal or beneficial ownership interest in the capital stock of Franchisee; (2) any merger or consolidation of Franchisee, whether or not Franchisee is the surviving corporation; (3) any transfer as a result of a divorce, insolvency or dissolution proceeding or otherwise by operation of law; (4) any transfer on the death of Franchisee or any Owner of Franchisee by will, declaration of trust or under the laws of intestate succession; and (5) any foreclosure of your Store or your transfer, surrender or loss of possession, control or management of your Store.

(c)     You or your Owners may not sell, transfer or assign, or purport to sell, transfer or assign, any ownership interest in or to any Confidential Information, Customer Information, or goodwill associated with the System, either as part of a Transfer of the Franchise or otherwise. In the event of a proposed Transfer of the Franchise, you agree to advise any prospective transferee of MSKS's ownership of such information and our license to use and sublicense the use of such information. You also agree to advise any prospective transferee that such information does not form part of the purchased assets. Should we approve the Transfer of the Franchise, you may, subject to compliance by you and the transferee with all relevant privacy laws relating to the retrieval, use, storage and transmission of personal information of such customers, provide such Customer Information to the transferee. You may also at that time deliver any

supplier lists to the transferee. You may not retain or use any Customer Information or supplier information, in any format or media, in whole or in part, for any purpose, after the Transfer of the Franchise.

(d)     Our approval of a Transfer of the Franchise does not constitute: (a) a representation as to the fairness of the terms of any agreement or arrangement between you or your Owners and the transferee, the completeness or accuracy of any of the information you have provided to the transferee or as to the prospects of success of your Store by the transferee; or (b) a release of you and your Owners, a waiver of any claims against you or your Owners or a waiver of our right to demand the transferee's exact compliance with this Agreement. Any approval shall apply only to the specific Transfer of the Franchise being proposed and shall not constitute an approval of, nor shall be deemed to have any effect on, any other transfer of the Franchise.

## 11.2   Conditions for Approval

If we have not exercised our rights under Section 11.6, then we will not unreasonably withhold our approval of a Transfer of the Franchise that meets all of our internal restrictions, requirements, factors, considerations and conditions that we may periodically require, but you acknowledge and agree that our consent to and approval of a Transfer of the Franchise is subject to, among other things, all of the following:

(a)     you and your Owners and Affiliates must be in compliance with the provisions of this Agreement and all other agreements with us or any of our Affiliates, whether relating to your Store or any other Metal Supermarkets store;

(b)     the transferee (and its owners) must meet our then-applicable, standards, for Metal Supermarkets store franchisees;

(c)     the transferee (or its Operating Principal) and its Manager, if applicable, must complete our Initial Training Program to our satisfaction;

(d)     the transferee (and its owners) must execute our then current standard form of franchise agreement and related documents used in the state in which your Store is located (which may contain provisions materially different from those contained in this Agreement including different royalties, term and other rights and obligations);

(e)     to defray our expenses incurred in connection with the transfer process, including the training of the transferee, and to compensate us for waiving the Initial Franchise Fee for the approved transferee under their franchise agreement, you must pay us a transfer fee that is segmented into the following three (3) components:

i.     A transfer approval fee of Two Thousand Five Hundred Dollars ($2,500), required in each instance of your request for our approval of each prospective transferee, due at and as a condition of the request for approval;

ii.     A transfer transferee training fee of Five Thousand Dollars ($5,000), required for training the approved transferee and due prior to and as condition of the commencement of such transferee's training; and

iii.     A transfer closing fee of Ten Thousand and Five Hundred Dollars ($10,500), required for processing the Transfer and due prior to and as a condition of closing or effecting the Transfer.

(f)      all of the parties to the transaction (including you, your Owners and Affiliates, and the transferee, and its Owners and Affiliates) must sign our consent to transfer agreement, in the form that we provide (which will include, among other things, a general release of all claims against us and our Affiliates, stockholders, officers, directors, members, managers, employees, agents, successors and assigns);

(g)      the terms of the proposed Transfer of the Franchise must not in our sole judgment place an unreasonable financial or operational burden on the transferee;

(h)      any financing you or any of your Owners or Affiliates offer the transferee must be subordinate to any current or future obligations of the transferee to us;

(i)      you, your Owners and your Operating Principal must execute a non-competition covenant, in form and substance satisfactory to us, in favor of us and the transferee, agreeing that, for a period of two (2) years, starting on the effective date of the Transfer, you, your Owners and Operating Principal will not: (1) directly or indirectly own a legal or beneficial interest in, or render services or give advice to: i) any Competitive Business operating at the Premises, ii) any Competitive Business operating within the Protected Area, iii) any Competitive Business operating within a fifteen (15) mile radius from the Premises, iv) any Competitive Business operating within a ten (10) mile radius of any other Metal Supermarkets store in existence, or v) any entity which grants franchises, licenses or other interests to others to operate any Competitive Business; or (2) directly or indirectly solicit (e.g., through telemarketing, e-mailing, faxing, mailer program, social media, Internet, Online Sites, and mobile applications, and other marketing efforts that we reasonably determine to constitute a solicitation) any former, current or prospective customer of your Store. The foregoing restrictions on competitive activities do not apply to: (i) the ownership or operation of other Metal Supermarkets stores that are licensed or franchised by us or any of our Affiliates; or (ii) the ownership of shares of a class of securities that are listed on a stock exchange or traded on the over-the-counter market and that represent less than five percent (5%) of that class of securities;

(j)      each of the transferee's owners must execute an Owner's Personal Guaranty, in the form attached to this Agreement as Schedule D or as we may otherwise designate, undertaking to personally guarantee, and to be personally bound jointly and severally by, the terms of this Agreement;

(k)      you shall be responsible for and must pay any broker or sales commission fees charged by any third party that is engaged in connection with introducing the transferee and/or facilitating the Transfer, and shall indemnify us from having to pay any such fees;

(l)      we will have the right to communicate with the proposed buyer (and its counsel) and to: truthfully answer their questions about our System, our company, and your operations; exchange information; and seek information from the buyer about their qualifications and characteristics (and the proposed transferor(s) and the proposed buyer(s) must cooperate with us in this regard);

(m)      the transferor must acknowledge and agree that the transferor shall remain bound by all of the covenants contained in Section 10 of this Agreement;

(n)      the transferee and landlord must sign and deliver to us a new Lease Addendum if the lease or sublease for the Premises is to be transferred as part of the Transfer; and

(o)      you, your Owners, your Operating Principal and Affiliates must execute such other documents and do such other things as we may reasonably require to protect our rights under this Agreement and any other agreements between you, your owners and your Affiliates and us and our Affiliates.

### 11.3    Transfer to An Entity

We will not withhold our consent to the assignment of this Agreement to a corporation, partnership or limited liability corporation that you form for the convenience of ownership, provided that: (a) the entity has and will have no other business besides operating the Store, and the Parties acknowledge and agree that ownership of property, even if it is the Premises, is "another business" that is not permitted; (b) you satisfy the conditions in Section 11.2 above; and (c) the Owners hold equity interests in the new entity in the same proportion shown in Schedule C of this Agreement. We will not impose a transfer fee as required under Section 11.2(e) for such a transfer, provided that you reimburse us for any out-of-pocket expenses that we incur in reviewing and/or documenting a Transfer under this Section 11.3. No such assignment will relieve you or your Owners of your obligations hereunder, and you and your Owners remain jointly and severally liable for all obligations hereunder.

### 11.4    Special Transfers

In the case of any transfer of interests held in the Franchisee among any of your then-current Owners (whom we have previously approved), we will not: (a) require payment of a transfer fee for such a transfer, so long as you instead reimburse us for the out-of-pocket expenses (including attorneys' fees) we incur in connection with reviewing, documenting, and approving the transfer ; and (b) apply our right of first refusal under Section 11.6 to any Transfer of the Franchise to any member of the immediate family of Franchisee (if an individual) or any member of the immediate family of a then-current Owners (whom we have previously approved in writing) of Franchisee (if Franchisee is a corporation, limited liability company, or partnership). Except as noted above, all other conditions of Section 11 shall apply to a Transfer of the Franchise as contemplated under this Section 11.4.

### 11.5    Death or Disability of Franchisee

Upon your death or permanent disability, or the death or permanent disability of an Owner who has a controlling interest in the Franchisee entity, the executor, administrator or other personal representative of such person must transfer his or her interest in this Agreement or in Franchisee to a third party approved by us in accordance with all of the applicable provisions of this Section 11 within a reasonable period of time, not to exceed nine (9) months from the date of death or permanent disability.

### 11.6    Franchisor's Right of First Refusal

(a)    If you or any of your Owners desires to transfer the Franchise for legal consideration, you or such Owner must obtain a bona fide, executed written offer and earnest money deposit in the amount of at least ten percent (10%) of the offering price from a responsible and fully disclosed potential purchaser and must deliver immediately to us a complete and accurate copy of such offer, together with copies of all other agreements, documents and other information (written or oral) you or your agents have delivered to the potential purchaser. If the potential purchaser proposes to buy any other property or rights from you or any of your Owners or Affiliates as part of the bona fide offer, the proposal for such property or rights must be set forth in a separate, contemporaneous offer that is disclosed to us, and the price and terms of purchase offered to you or your Owners for the Transfer of the Franchise must reflect the bona fide price offered therefor and may not reflect any value for any other property or rights.

(b)    We have the option, exercisable by notice delivered to you or your Owners within thirty (30) days from the date of delivery of a complete and accurate copy of such offer to us, to purchase such interest for the price and on the terms and conditions contained in such offer, provided that:  (a) we may substitute cash for any form of payment proposed in such offer; (b) our credit shall be deemed equal to the credit of any proposed purchaser; and (c) we will have not less than ninety (90) days from the option

exercise date to consummate the transaction. We have the right to investigate and analyze the business, assets and liabilities and all other matters we deem necessary or desirable in order to make an informed investment decision with respect to the fairness of the terms of our right of first refusal. We may conduct such investigation and analysis in any manner we deem reasonably appropriate and you and your Owners agree to cooperate fully with us in connection therewith.

(c)     If we exercise our option to purchase, we are entitled to purchase such interest subject to all representations and warranties, closing documents and indemnities as we reasonably may require. If we do not exercise our option to purchase, you or your Owners may complete the sale to such potential purchaser pursuant to and on the exact terms of such offer, subject to our approval of the transfer as provided in Sections 11.1 and 11.2, provided that if the sale to such potential purchaser is not completed within ninety (90) days after delivery of such offer to us, or if there is a change that we deem to be material in the terms of the offer, you agree to promptly notify us and we will have an additional option to purchase (on the terms of the revised offer, if any, and otherwise as set forth herein) during the thirty (30) day period following your notification of the expiration of the ninety (90) day period or the material change to the terms of the offer.

### 11.7     Securities Offerings By Franchisee

All materials for an offering of stock, ownership, and/or partnership interests in you or any of your affiliates that are required by law must be submitted to us for review as described below before such materials are filed with any government agency. Any materials to be used in any exempt offering must be submitted to us for such review before their use.

(a)     You agree that: (i) no offering by you or any of your affiliates may imply (by use of the Proprietary Marks or otherwise) that we are participating in an underwriting, issuance, or offering of your securities or your affiliates; (ii) our review of any offering will be limited solely to the relationship between you and us (and, if applicable, any of your affiliates and us); and (iii) we will have the right, but not obligation, to require that the offering materials contain such written statements as we may require concerning the limitations stated above.

(b)     You (and the offeror if you are not the offering party), your Principals, and all other participants in the offering must fully indemnify us and all of the Franchisor Parties (as defined in Section 15.3 below) in connection with the offering.

(c)     For each proposed offering, you agree to pay us a non-refundable fee of Ten Thousand Dollars ($10,000) or such greater amount as is necessary to reimburse us for our reasonable costs and expenses (including legal and accounting fees) for reviewing the proposed offering.

(d)     You agree to give us written notice at least thirty (30) days before the date that any offering or other transaction described in this Section 11.7 starts. Any such offering will be subject to all of the other provisions of this Section 11; and further, without limiting the foregoing, it is agreed that any such offering will be subject to our approval as to the structure and voting control of the offeror (and you, if you are not the offeror) after the financing is completed.

(e)     You must also, for the remainder of the term of the Agreement, submit to us for our review and prior written approval all additional securities documents you are required to prepare and file (or use) in connection with any offering of stock, ownership, and/or partnership interests. You must reimburse us for our reasonable costs and expenses we incur in connection with our review of those materials.

### 11.8  Franchisee Bankruptcy

(a)     If you or any of your Owners file or become the subject of a petition for relief under Title 11 of the United States Code or under any successor or similar federal or state bankruptcy, insolvency or receivership statute (hereafter referred to as "Franchisee's Bankruptcy"), and, for any reason, this Agreement is not terminated pursuant to Section 12, then you shall immediately inform us of Franchisee's Bankruptcy and disclose the specific court in which such action is pending.

(b)     You acknowledge that this Agreement is an executory contract.  In the event of Franchisee's Bankruptcy, promptly upon written demand by us, but in no event more than thirty (30) days following such demand, you shall determine whether to assume or reject this Agreement as an executory contract, shall advise us of your decision, shall advise us of the manner in which you propose to provide us with adequate assurances of future performance, and shall diligently pursue any required approvals.

(c)     In the event of Franchisee's Bankruptcy, if you wish to assign to any person or entity who has made a *bona fide* offer to accept an assignment of this Agreement, then notice of such proposed assignment, setting forth the name and address of the proposed assignee and all of the terms and conditions of the proposed assignment, shall be given to us within twenty (20) days after receipt of such proposed assignee's offer to accept the assignment of this Agreement, and, in any event, within ten (10) days prior to the date that the application is made to a court of competent jurisdiction for authority and approval to enter into such assignment and we shall thereupon have a right of first refusal on the terms and conditions set forth in Section 11.6, except that we may deliver notice of our exercise of our right of first refusal at any time prior to the effective date of the proposed assignment.

### 11.9  Transfer by Franchisor

We have the right to transfer or assign all or any part of our rights or obligations under this Agreement to any person or legal entity.  If the assignee shall expressly assume and agree to perform all of our obligations under this Agreement accruing after the date of assignment, then the assignee shall become solely responsible for such obligations and we, as the assignor shall have no liability therefore.  In addition, and without limiting the foregoing, we may sell our assets; may sell our securities in a public offering or in a private placement; may merge, amalgamate or reorganize with or acquire other corporations, or be acquired by another corporation; and may undertake any refinancing, recapitalization, leveraged buy-out, or other economic or financial restructuring.

## 12.  TERMINATION OF AGREEMENT.

### 12.1  Immediate Termination

You will be in material breach of this Agreement, and this Agreement will automatically terminate without notice, if we so determine, if you become insolvent or are unable to pay your debts as they mature; or if a receiver or other custodian, permanent or temporary, is appointed for your business, assets or property; or if you request the appointment of a receiver or make a general assignment for the benefit of creditors; or if final judgment against you in the amount of Twenty-Five Thousand Dollars ($25,000) or more remains unsatisfied of record for thirty (30) days or longer; or if your bank accounts, property or accounts receivable are attached; or if execution is levied against your business or property; or if suit is filed to foreclose any lien or mortgage against any of your assets and such suit is not dismissed within thirty (30) days; if you are adjudicated bankrupt or insolvent; or if you voluntarily dissolve or liquidate; or if a petition is filed against you for dissolution or liquidation and such petition is not dismissed within thirty (30) days.

## 12.2    Termination Upon Notice

In addition to our right to terminate pursuant to other provisions of this Agreement and under applicable law, you will be in breach of this Agreement and we will have the right to terminate this Agreement, effective upon delivery of notice of termination to you, if you or any of your Owners, Operating Principal or Affiliates:

(a)    fail to open your Store and start business, as provided in Section 4.2;

(b)    knowingly maintain false books or records, submit any false reports, or make any material misstatement or omission to us (including, but not limited to, information provided as part of your application for this franchise);

(c)    suffer cancellation or termination of the lease or sublease for your Store;

(d)    are convicted of, or plead no contest to, a felony, a crime involving moral turpitude, or any other crime or offense that we believe is reasonably likely to have an adverse effect on the System, the Marks, the goodwill associated therewith, or our interest therein;

(e)    make an unauthorized Transfer of the Franchise or any of the assets utilized in the operation of the Franchise;

(f)    make any unauthorized use or disclosure of any Confidential Information or use, duplicate or disclose any portion of the Operations Manual in violation of this Agreement;

(g)    are in breach of or in default under any other agreement with us or any of our Affiliates relating to this or any other Metal Supermarkets store;

(h)    after opening your Store, you fail for any reason to have it open for business for any four (4) consecutive days or clearly demonstrate or announce that you have ceased operations;

(i)    are past due in the payment of rent under the lease for the Premises of your Store for fifteen (15) days or more;

(j)    engage in any conduct which could in our opinion materially impair the goodwill associated with the trademarks and/or the System;

(k)    understate your Gross Sales, in any report to us, by four percent (4%) or more; or

(l)    fail on three (3) or more separate occasions within any period of twenty-four, (24) consecutive months to pay when due royalties or other payments due us or any of our Affiliates, or otherwise fail to comply with this Agreement or any mandatory specification, standard or operating procedure, whether or not such failures are corrected after notice of default is delivered to you and whether or not such failures relate to the same or different matters.

## 12.3    Termination Upon Notice and Opportunity to Cure

Except as otherwise provided in Sections 12.1 and 12.2 of this Agreement, upon any other default by you, we may terminate this Agreement only by giving written notice of termination (in the manner set forth under Section 16.13 below) stating the nature of such default to you at least thirty (30) days prior to the effective date of termination (or in the case of your non-payment of any amounts due to us under this

Agreement, at least ten (10) days prior to the effective date of termination); provided, however, that you may avoid termination by immediately initiating a remedy to cure such default, curing it to our satisfaction, and by promptly providing proof thereof to us within the 30-day (or 10-day) period. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to you, effective immediately upon the expiration of the 30-day period (10-day period for non-payment defaults) or such longer period as applicable law may require.

## 13.     RIGHTS TO A SUCCESSOR FRANCHISE.

### 13.1     Your Right to Acquire A Successor Franchise

You have the right, subject to the conditions contained in this Section 13; to acquire a successor franchise for your Store for one (1) additional term, if upon expiration of the Term: (a) you, your Owners, Operating Principal and any Affiliates are in compliance with this Agreement and all other agreements with us or any of our Affiliates, whether relating to your Store or any other Metal Supermarkets store, and you and your Owners have been, in our opinion, in substantial compliance with this Agreement and all other agreements with us or any of our Affiliates throughout the Term where material periods of a failure to comply with the obligations, covenants, standards or requirements of any agreement or our System during the Term may substantiate a lack of compliance; (b) you pay us a successor franchise fee as further described below; (c) you maintain the right to possession of the Premises for the term of the successor franchise agreement; and (d) enter into an agreement with us whereby you agree within a specified time period, starting on the signing of a successor franchise agreement, to remodel your Store, add or replace fixtures, furnishings, equipment and signs and otherwise modify your Store to upgrade your Store to the specifications and standards then applicable for new Metal Supermarkets stores. The successor franchise fee (which is the fee you must pay as consideration for renewing the right to operate the Store and use the System solely in connection therewith for a successor term, including the services that we will provide at the time of renewal) is Ten Thousand Dollars ($10,000). The successor franchise fee is payable to us in full at the time you provide us with notice under Section 13.2 below that you intend to acquire a successor term, and is non-refundable unless we determine not to grant you a successor franchise. The length of the successor term will be equal to the initial term of our then-current Franchise Agreement.

### 13.2     Notices

You agree to give us notice of your desire to acquire a successor franchise at least one hundred and eighty (180) days prior to the expiration of this Agreement. We will give you notice, not later than sixty (60) days after receipt of your notice, of our decision whether you have the right to acquire a successor franchise pursuant to Section 13.1. Notwithstanding that our notice may state that you have the right to acquire a successor franchise for your Store, such acquisition right will be subject to your continued compliance with all the provisions of this Agreement up to the date of its expiration. If we determine you do not have the right to a successor franchise, as above provided, then this Agreement shall expire at the end of the Term and you, all of your Owners and Operating Principal shall be subject to all of the provisions applicable on expiration, including those contained in Sections 10.4 and 14.

### 13.3     New Agreements

(a)     If you have the right to acquire a successor franchise in accordance with Section 13.1 and state your desire to exercise that right in accordance with Section 13.2, we and you (and your Owners) will execute our then-current standard form (or our most recent form if we are no longer offering franchises for any reason) (which may contain provisions materially different from those contained herein) and all Ancillary Agreements (including personal guarantees by your Owners and an agreement to remodel the Store to comply with Section 13.1(d) on such terms as we deem appropriate). You and your Owners agree

to also execute general releases, in form and substance satisfactory to us, releasing us, and our Affiliates, officers, directors, employees, agents, successors and assigns, from any and all claims. Failure by you (and your Owners) to sign such agreements and releases within thirty (30) days after delivery to you will be deemed an election by you not to acquire a successor franchise for your Store.

(b)     In the event that you do not provide us with the 180 days' notice, we determine that you do not qualify for a successor franchise pursuant to the terms of Section 13.1 above, or you do not sign the new agreements and general releases within thirty (30) days of delivery to you, we have the right to market the franchise for the Protected Area in any manner we deem appropriate, including through brokers or other agents.

### 13.4    Holdover Situation

If, for any reason, you continue to operate your Store after the expiration of the Term without having been granted a successor franchise, you shall be deemed to be operating on a month-to-month basis under the terms and conditions of this Agreement, provided, however, that there will be a 50% increase in the amount of royalties payable by you during any such holdover period. In such circumstances, and notwithstanding the foregoing, we may, on ten (10) days written notice, terminate this Agreement.

## 14.    EFFECT OF TERMINATION OR EXPIRATION.

### 14.1    Payment of Outstanding Amounts

You agree to pay us and our Affiliates, within thirty (30) days after the effective date of termination or expiration (without grant of a successor franchise) all royalties, amounts owed for purchases from us or our Affiliates, interest due on any of the foregoing and all other amounts owed to us or our Affiliates which are then unpaid. You also agree to pay all of your suppliers any outstanding amounts that are not subject to bona fide dispute.

### 14.2    Discontinue Use of Marks and Confidential Information

Upon any termination or expiration (without the grant of a successor franchise) of this Agreement, you agree to immediately do all of the following:

(a)     Immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures and techniques associated with the System, the Mark "Metal Supermarkets," and all other Marks and distinctive forms, slogans, signs, symbols, and devices associated with the System (including all signs, advertising materials, displays, stationery, forms, e-mail addresses, and any other articles which display the Marks), and you shall not thereafter, directly or indirectly, represent to the public or hold yourself out as our present or former franchisee (except to the extent that you are authorized to do so under another valid franchise agreement with us for a different Metal Supermarkets store).

(b)     Take such action as may be required to cancel all fictitious or assumed name registrations relating to your use of any Mark.

(c)     Notify, and take such other action as necessary, but only as directed by us, the telecommunications companies and all telephone and online directory publishers of the termination or expiration of any rights you may have to use any numbers, designations, addresses or listings associated with your Store and to authorize transfer of such listings to us or at our direction (unless you know that we already own such listings). You acknowledge that, as between you and us, we have the rights to and interest in all telephone, telecopy and other telecommunications numbers and listings associated with your Store.

You authorize us, and hereby appoint us and any of our officers as your attorney in fact, to direct the appropriate third parties to transfer any numbers, identities and listings relating to your Store to us or at our direction, should you fail or refuse to do so, and the appropriate parties may accept such direction or this Agreement as conclusive evidence of our exclusive rights in such numbers, identities and listings and our authority to direct their transfer.

(d)     If we do not exercise our right to purchase the assets of your Store pursuant to Section 14.4, and subject at all times to your obligations under Section 10.4 above, promptly remove from the Premises, and discontinue using for any purpose, all signs, fixtures, equipment, Trade Dress, advertising materials, forms and other materials and supplies which display any of the Marks or any distinctive features, images, or designs associated with Metal Supermarkets stores and, at your expense, make such alterations as may be necessary to distinguish the Premises so clearly from its former appearance as a Metal Supermarkets store as to prevent any possibility of confusion by the public;

(e)     Immediately cease to use all Confidential Information and return to us all such Confidential Information and any extracts, copies of derivative works therefrom, including the Operations Manual and any other confidential materials which we have loaned to you.

(f)     Immediately discontinue any mode of communications on the Internet or other communications system directly or indirectly relating to your Store, including any Web sites, social media platforms, links, or pages and e-mail addresses associated with your Store, and immediately take all steps required by us to transfer any domain name associated with your Store to us. You irrevocably appoint the person who is then our president as your duly authorized agent and attorney-in-fact to execute all instruments and take all steps to transfer such domain names to us.

(g)     Immediately cease to use (and return to us all copies of) all technology licensed by us or any of our Affiliates and comply with your obligations under any technology license agreements.

(h)     Provide us with a complete list, in a format satisfactory to us, of all Customer Information and destroy any remaining copies of such Customer Lists.

(i)     Within thirty (30) days after the effective date of termination or expiration, you will furnish us evidence satisfactory to us of your compliance with the foregoing obligations.

(j)     Upon expiration or termination of this Agreement, you shall not, directly or indirectly, sell, assign, transfer, lease or otherwise dispose of any inventory or assets used in the operation of your Store, including the lease for the premises, to any Competitive Business, or to any person whose use of such inventory or assets would be a violation of the terms of Section 10 above.

**14.3    Customer Lists**

For absolute clarity, upon any termination or expiration (without the grant of a successor franchise) of this Agreement, we and our Affiliates will have the unrestricted right, without paying you any consideration, to offer and sell, and to permit other franchisees of ours to offer and sell, any products and/or services, to any and all former, current and prospective customers of your former Store. You acknowledge and agree that all Customer Information is Confidential Information, and belongs exclusively to MSKS. You further acknowledge and agree that MSKS has granted to us, indirectly, an exclusive license to use, and to grant sublicenses to others to use Confidential Information, you shall not retain or use any Confidential Information, including but not limited to, Customer Information, in any format or media, in whole or in part, for any purpose, after any termination or expiration of this Agreement. You acknowledge

and agree that breach of this provision, including direct or indirect solicitation by you, your Owners or by your Operating Principal, shall entitle us to seek and obtain injunctive relief.

### 14.4    Our Option to Purchase Your Store

(a)    Upon termination or expiration of this Agreement (without grant of a successor franchise in accordance with Section 13), we will have the option to be exercised within thirty (30) days after termination or expiration, or thirty (30) days prior to expiration (if you have failed to provide us with notice to elect a successor franchise within 180 days before expiration of this Agreement, or after providing us with such notice you fail to execute the successor franchise agreement more than thirty (30) days prior to expiration), to purchase from you any or all of the equipment, signs, fixtures, supplies, and inventory related to the operation of the Store (those assets that we choose to purchase are referred to as the "Purchased Assets"). You agree to enter into with us a purchase agreement for the Purchased Assets, in such form and containing such provisions as we may specify, within twenty (20) days after our delivery of such document to you. You agree to cooperate and facilitate our acquisition of Purchased Assets, and shall sign such documents and do such things for such purpose. If we elect to exercise our option to purchase the Purchased Assets as provided for in this Section 14.4, we will have the right to set off against and reduce the purchase price by any and all amounts owed by you to us or our affiliates.

(b)    The purchase price for the Purchased Assets will be the net book value (as defined below). "net book value" shall mean the net book value of your Store's tangible assets we choose to purchase as of the time of termination or expiration, determined by reference to the financial statements, using our standard chart of accounts and conforming to generally accepted accounting principles (consistently applied) that you are required to submit to us pursuant to Section 8. However: (1) each depreciable asset will be valued at the lesser of the net value of the asset as depreciated: (a) on a "straight line" basis from the date of its acquisition over its useful life without provision for salvage value; or (b) according to the method you use for federal income tax purposes; and (2) we may exclude from the assets purchased any fixtures, equipment, furniture, signs, products, materials or supplies of your Store that have not been acquired in compliance with this Agreement. If we are not satisfied for any reason with the accuracy of any financial information you have submitted to us or that reside on our system and which is used to determine the purchase price, or if none have been submitted or made available, net book value will be determined by an audit conducted by certified public accountants we select, the cost of which will be borne by you. The results of such audit will be final and binding on both parties.

(c)    The purchase price, as determined above, for the Purchased Assets shall be paid 50% in cash at the closing, which shall take place no later than thirty (30) days after the delivery of our purchase agreement to you. The remainder of the purchase price (plus accrued and unpaid interest on the unpaid balance, at the Prime Rate, as defined below, from and after the closing date) shall be payable on the first anniversary of the closing date. If you disagree with the purchase price for the Purchased Assets set out in the purchase agreement, whether or not an audit is conducted as permitted under Section 14.4(b) above, you nevertheless agree to enter into the purchase agreement we require, however, we agree to reasonably discuss the purchase price with you following the closing and, if applicable, conduct an audit by certified public accountants we select (the cost of which will be borne by you). Any revisions to the purchase price that we and you agree upon during these discussions (and, if applicable, following an audit) will be adjusted at the time we pay the remainder of the purchase price on the first anniversary of the closing date. The "Prime Rate" shall be the prime rate as of the date of closing (or the next business day, if closing is not on a business day) as published in The Wall Street Journal, Eastern edition, or such other publication that we may select.

(d)     You agree that, at our option, you will assign to us any interest which you have in the lease or sublease for the Premises upon which the Store is operated and/or for the building from which the Store is operated.

### 14.5   Continuing Obligations

All obligations under this Agreement which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect until they are satisfied in full or by their nature expire.

## 15.   RELATIONSHIP OF THE PARTIES.

### 15.1   Independent Contractors

(a)     You and we, as between ourselves, are and will be independent contractors. Neither this Agreement nor the dealings of the parties pursuant to this Agreement will create any fiduciary relationship or any other relationship of trust or confidence between the parties hereto.

(b)     Nothing contained in this Agreement, or arising from the conduct of the parties hereunder, is intended to make either party a general or special agent, joint venturer, partner or employee of the other for any purpose whatsoever. You agree to conspicuously identify yourself in all dealings with customers, lessors, contractors, suppliers, public officials, employees and others as the owner of your Store and agree to place such other notices of independent ownership at the Store and on forms, business cards, stationery, advertising and other materials as we may periodically require.

(c)     You may not make any express or implied agreements, warranties, guarantees or representations or incur any debt in our name or on our behalf or represent that the relationship of the parties hereto is anything other than that of independent contractors. We will not be obligated by or have any liability under any agreements made by you with any third party or for any representations made by you to any third party. We will not be obligated for any damages to any person or property arising directly or indirectly out of the operation of your business hereunder.

### 15.2   Your Independence.  You acknowledge and agree that:

(i)     we are not the employer or co-employer of any of your employees (even though we may provide you with advice, guidance, and training that may be applicable or available to your employees), and we will not play any role in decisions regarding their employment (including but not limited to matters such as recruitment, hiring, scheduling, compensation, employee relations, labor matters, review, and/or dismissal);

(ii)     the guidance that we provide and requirements under which you will operate are intended to promote and protect the value of the brand and the Marks;

(iii)     when forming and in operating your business, you had to adopt standards to operate that business, and that instead of developing and implementing your own standards (or those of another party), you chose to adopt and implement our standards for your business (including but not limited to our System and the requirements under this Agreement); and

(iv)     when forming and in operating your business, you agree to adopt standards to operate that business, and that instead of developing and implementing your own standards (or those of

another party), you chose to adopt and implement our standards for your business (including our System and the requirements under this Agreement); and

(v)    you have made and (will remain responsible at all times) all of the organizational and basic decisions about establishing and forming your entity, operating your business (including but not limited to adopting our standards as your standards), hiring, scheduling and disciplining employees, engaging professional advisors, and all other facets of your operation.

### 15.3    Indemnification

(a)    You agree to indemnify, defend, and hold harmless each of the Franchisor Parties against any and all Damages that arise directly or indirectly from any Asserted Claim and/or from your breach of this Agreement. Your indemnity obligations will survive the expiration or termination of this Agreement, and will not be affected by the presence of any applicable insurance policies and coverages that you or we may maintain.

(b)    As used in Section 15.3(a) above, the parties agree that the following terms will have the following meanings:

(i)    "Asserted Claim" means any allegation, claim or complaint that is the result of, or in connection with, your exercise of your rights and/or carrying out of your obligations under this Agreement (including, but not limited to, any claim associated with your operation of the Store, data breaches and similar incidents, and otherwise), and/or any default by you under this Agreement, notwithstanding any claim that any Franchisor Party was or may have been negligent.

(ii)    "Damages" means all claims, demands, causes of action, suits, damages, liabilities, fines, penalties, assessments, judgments, losses, and expenses (including, without limitation, all expenses, costs and lawyers' fees incurred for any indemnified party's primary defense or for enforcement of its indemnification rights).

(iii)    "Franchisor Parties" means us, our shareholders, parents, subsidiaries, and Affiliates, and their and our respective officers, directors, members, managers, employees, and agents.

### 15.4    Taxes

You agree to promptly pay to us an amount equal to all taxes levied or assessed, including unemployment taxes, sales taxes, use taxes, withholding taxes, excise taxes, personal property taxes, intangible property taxes, gross receipt taxes, taxes on royalties, any similar taxes or levies, imposed upon or required to be collected or paid by us by reason of the furnishing of products, intangible property (including trademarks) or services to you. In the event of a *bona fide* dispute as to your liability for taxes, you may contest your liability in accordance with applicable law.

## 16.    MISCELLANEOUS

### 16.1    Mediation

Except as otherwise provided in Section 16.4 below or in the instance where the Store has been closed or this Agreement has been terminated, the parties agree that no civil action, lawsuit, or other dispute will be commenced in a court of law until the matter has been submitted to non-binding mediation conducted by the JAMS Alternative Dispute Resolution Center in Washington, D.C. in accordance with JAMS' then-current rules for mediation of international commercial disputes. Both parties agree to

cooperate in connection with any such mediation, and understand that they will be required to sign a confidentiality agreement before participating in any mediation proceeding. The parties further agree to equally share all mediation service provider fees and charges and pay these fees or retainers in advance of commencement of mediation. Further, each party otherwise acknowledges that they are responsible for their own fees and expenses relative to their participation in mediation. If a party fails to provide timely payment of their allocation of shared mediation service provider fees, this failure shall be considered and acknowledged by all parties as a waiver of any obligation to apply this or any mediation obligation to the contemplated dispute. The mediation will take place in Washington, D.C. (unless the parties mutually agree to mediate in another city). Once either party has submitted a dispute to mediation, the obligation to attend will be binding on both parties. Each party will bear its own costs with respect to the mediation.

### 16.2   Venue

If a dispute is not settled through mediation conducted under Section 16.1 above within thirty (30) days after a dispute has been submitted to mediation in accordance with Section 16.1, or such additional period as the parties may agree upon in writing, then, subject to Section 16.4 below, you agree that any action that you bring against us, in any court, whether federal or state, must be brought only within the federal or state courts having jurisdiction over Erie County, New York. Any action that we bring against you in any court, whether federal or state, may be brought within the federal or state courts having jurisdiction over Erie County, New York. The parties agree that this Section 16.2 shall not be construed as preventing either party from removing an action from state to federal court; provided, however, that venue shall be as set forth above. The parties hereby waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision.

### 16.3   Governing Law

The parties agree that the State of New York has a deep and well-developed history of business decisional law. For this reason, the parties agree that all relations between us and you, and any and all disputes between us and you, whether sounding in contract, tort, or otherwise, are to be exclusively construed in accordance with and/or governed by the laws of the State of New York (without reference to and without applying New York (or any other) choice of law or conflicts of law principles) (except to the extent governed by the US Trademark Act of 1946 (the Lanham Act; 15 U.S.C. § 1050, et seq.), as amended). If, however, any provision of this Agreement would not be enforceable under the laws of New York, and if the Store is located outside of New York and the provision would be enforceable under the laws of the state in which the Store is located, then the provision in question (and only that provision) will be interpreted and construed under the laws of that state. Nothing in this Section 16.3 is intended to invoke the application of any franchise, business opportunity, antitrust, "implied covenant," unfair competition, fiduciary or any other doctrine of law of the State of New York or any other state which would not otherwise apply absent this Section 16.3.

### 16.4   Injunctive Relief

Nothing contained in this Agreement shall bar our right to obtain injunctive relief against actual or threatened conduct that will cause us loss or damages for which no adequate remedy at law may be available or which may cause us irreparable harm, under the applicable equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions. We are entitled to such injunctive relief without the need to post a bond, and you agree to waive any requirement that we post an injunction bond. The entry of such injunctive relief does not preclude us from obtaining any other relief that we may be entitled to in equity or at law.

### 16.5   Costs and Attorneys' Fees

You agree to pay us all damages, costs and expenses (including without limitation reasonable attorneys' fees, court costs, discovery costs, and all other related expenses) that we incur at any time in: (a) obtaining injunctive or other relief including the successful initiation and proof of claim for the enforcement of any provisions of this Agreement (including without limitation Sections 9 and 12 above); or (b) successfully defending a claim from you that we misrepresented the terms of this Agreement, fraudulently induced you to sign this Agreement, that the provisions of this Agreement are not fair, were not properly entered into, and/or that the terms of this Agreement (as it may be amended by its terms) do not exclusively govern the parties' relationship.

### 16.6   Limitations on Legal Claims

(a)   Waiver of Jury Trials.  Each party to this Agreement irrevocably waives trial by jury in any action, proceeding, or counterclaim, whether at law or in equity, brought by either of them against the other, whether or not there are other parties in such action or proceeding.

(b)   Must Bring Claims Within Two Years.  Each party to this Agreement agrees that any and all claims and actions arising out of or relating to this Agreement, the parties' relationship, and/or your operation of the franchised business, brought by any party hereto against the other (except for claims seeking indemnification hereunder), must be commenced within two (2) years from the occurrence of the facts giving rise to such claim or action, or, it is expressly acknowledged and agreed by all parties, such claim or action will be irrevocably barred.

(c)   Waiver of Punitive Damages.  Each party to this Agreement hereby waives to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other, and agree that in the event of a dispute between them each will be limited to the recovery of any actual damages it has sustained.

(d)   No Class Actions.  Any action arising from a dispute in connection with this Agreement shall be conducted on an individual basis, and not as part of a consolidated, common, or class action.

### 16.7   Entire Agreement; Severability and Substitution of Provisions

(a)   This Agreement and the exhibits referred to herein constitute the entire, full, and complete contract between the parties concerning the subject matter hereof, supersede all prior agreements, and no other representations other than those in this Agreement have induced either party to execute this Agreement.  However, nothing in this Section (or elsewhere in this Agreement) is intended as, nor will it be interpreted to be, a disclaimer by us of any representation that we made in our Franchise Disclosure Document ("FDD") (including the exhibits and any amendments to the FDD).

(b)   Except for those changes that we are permitted to make unilaterally under this Agreement, no amendment, change, or variance from this Agreement will be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

(c)   Except as expressly provided to the contrary herein, each portion, section, part, term, and/or provision of this Agreement will be considered severable; and if, for any reason, any section, part, term, and/or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such will not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, and/or provisions of this Agreement as may remain otherwise intelligible; and the latter will continue to be given full force and effect and bind

the parties hereto; and said invalid portions, sections, parts, terms, and/or provisions will be deemed not to be a part of this Agreement.

(d)     If there is a conflict between any applicable law and the terms of this Agreement, then on our request you agree to cooperate with us and our counsel and to execute an amending letter that we require to replace the original term with a new term that is reasonably consistent and in compliance with law.

(e)     Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor will be deemed, to confer upon any person or legal entity other than you, we, and such of our respective successors and assigns as may be contemplated (and, as to you, permitted) by Section 11 above, any rights or remedies under or by reason of this Agreement.

(f)     All captions in this Agreement are intended solely for the convenience of the parties, and no caption will be deemed to affect the meaning or construction of any provision hereof.

(g)     All provisions of this Agreement which, by their terms or intent, are designed to survive the expiration or termination of this Agreement, will so survive the expiration and/or termination of this Agreement.

(h)     All consents that you are required to obtain pursuant to this Agreement must be in writing, and if we have not given consent in writing, our consent will be deemed to not have been given.

(i)     Although we may exercise any of our rights, carry out any of our obligations, or otherwise discharge any of our duties under this Agreement directly, through the use of employees, independent contractors, professional advisors (for example, a CPA), or otherwise, we will still remain responsible for the proper performance of our obligations to you under this Agreement.

(j)     Each party will bear all of the costs of exercising its rights and carrying out its responsibilities under this Agreement, except as otherwise provided.

(k)     This Agreement may be signed in counterparts, and signature pages may be exchanged by e-mail, mail, or other transmission method the parties may agree upon, and each such counterpart, when taken together with all other identical copies of this Agreement also signed in counterpart, will be considered as one complete Agreement.

### 16.8    Waiver of Obligations

We and you may by written instrument unilaterally waive or reduce any obligation of the other under this Agreement. Any waiver granted by us will be without prejudice to any other rights we may have and may be revoked at any time and for any reason, effective upon delivery to you of ten (10) days' prior notice. You and we may not be deemed to have waived any right reserved by this Agreement by virtue of any custom or practice of the parties at variance with it; any failure, refusal or neglect by you or us to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder; any waiver, forbearance, delay, failure or omission by us to exercise any right, whether of the same, similar or different nature, with respect to other Metal Supermarkets stores or franchises; or the acceptance by us of any payments due from you after any breach of this Agreement.

### 16.9    Exercise of Rights

The rights of Franchisor and Franchisee hereunder are cumulative and no exercise or enforcement by Franchisor or Franchisee of any right or remedy hereunder will preclude the exercise or enforcement by

Franchisor or Franchisee of any other right or remedy hereunder which Franchisor or Franchisee is entitled to enforce by law.

### 16.10  Construction

(a)  The language of this Agreement will be construed according to its fair meaning and not strictly against any party, regardless who drafted this Agreement.

(b)  The introduction, personal guarantees, schedules and addenda (if any) to this Agreement, as well as the Operations Manual, are a part of this Agreement and constitute the entire agreement of the parties.

(c)  Except as otherwise expressly provided herein, there are no other oral or written agreements, understandings, representations or statements relating to the subject matter of this Agreement that either party may or does rely on or that will have any force or effect. Nothing in this Agreement will be deemed to confer any rights or remedies on any person or legal entity not a party hereto, other than successors and assigns of any party to this Agreement whose interests is assigned in accordance with its terms.

(d)  This Agreement may not be modified except by written agreement signed by both parties.

(e)  The headings of sections are for convenience only and do not limit or construe their contents.

(f)  The words "includes" or "including" will be construed to mean "including but not limited to." References to section numbers are to section numbers in this Agreement, unless otherwise indicated.

(g)  The term "Franchisee" or "you" is applicable to one or more persons, a corporation, limited liability company, or a partnership and its owners individually, as the case may be.

(h)  If two or more persons are at any time Franchisee hereunder, or Franchisee is owned by two or more Owners, whether as partners, joint venturers or otherwise, then their obligations and liabilities to us will be joint and several.

(i)  Whenever this Agreement requires the approval or consent of either party, the other party must make written request therefor, and such approval or consent must be obtained in writing prior to the action or item for which approval is sought. This Agreement is binding on the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest. This Agreement may be executed in multiple copies, each of which will be deemed an original. Time is of the essence in this Agreement.

### 16.11  Anti-Terrorism Laws

You and the Owners agree to comply with and/or to assist us to the fullest extent possible in our efforts to comply with Anti-Terrorism Laws (as defined below). In connection with such compliance, you and the Owners certify, represent, and warrant that none of their respective property or interests are "blocked" under any of the Anti-Terrorism Laws and that neither you nor any of the Owners are in violation of any of the Anti-Terrorism Laws. You also agree not to knowingly hire or do business with (or continue to employ or do business with) any party who is blocked under any of the Anti-Terrorism Laws. The term "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, as

supplemented, the USA PATRIOT Act, and all other laws and regulations addressing or in any way relating to terrorist acts and/or acts of war.

### 16.12   Our Reasonable Business Judgment

We and you acknowledge and agree that this Agreement (and the relationship of the parties which arises from this Agreement) grants us the right to make decisions, take actions and/or refrain from taking actions consistent with your explicit rights and obligations hereunder that may affect favorably or adversely your interests. You understand and agree that we may operate and change the System and our business in any manner that is not expressly and specifically prohibited by this Agreement. Whenever we have reserved in this Agreement a right and/or discretion to take or withhold an action, or to grant or decline to grant you a right to take or withhold an action, except as otherwise expressly and specifically provided in this Agreement, we may make our decision or exercise our right and/or discretion on the basis of our judgment of what is in our best interests, including without limitation, our judgment of what is in the best interests of our franchise network, at the time our decision is made (our "reasonable business judgment"), without regard to: (1) whether other reasonable or even arguably preferable alternative decisions or actions could have been made by us; (2) whether our decision or the action we take promotes our financial or other individual interest; (3) whether our decision or the action we take applies differently to you and one (1) or more other franchisees; or (4) whether our decision or the exercise of our rights is adverse to your individual interests or the individual interests of any other particular franchisees. We will have no liability to you for any such decision or exercise of our rights.

### 16.13   Notices and Communications

(a)    Notices. Any and all notices, consents or approvals required or permitted under this Agreement shall be in writing and shall be personally delivered, sent by certified mail, or by e-mail from us to you (to your e-mail address shown in the introductory paragraph of this Agreement) which affords the sender evidence of delivery, of rejected delivery, or attempted delivery to the respective parties at the addresses, unless and until a different physical address has been designated by written notice to the other party of that party's physical new address. Any notice by a means that affords the sender evidence of delivery, rejected delivery, or delivery not possible because the recipient has moved or changed and left no forwarding address shall be deemed to have been given at the date and time of receipt, rejected, and/or attempted delivery. The Operations Manual, any changes that we make to the Operations Manual, and/or any other written instructions that we provide relating to operational matters, are not considered to be "notices" for the purpose of the delivery requirements in this Section 16.13.

(b)    Email Communications. The parties acknowledge and agree that exchanging information by e-mail is an important way to enable quick, effective, and efficient communication, and that each is entitled to rely on the other's use of e-mail for communicating as part of the economic bargain underlying this Agreement. To facilitate the use of e-mail to exchange information, each of us authorizes transmission of e-mail and transmission of e-mail by Official Senders (on matters pertaining to the business described under this Agreement) to the other during the term of this Agreement. In order to implement the terms of this Section, each of us agrees that: (i) the other's Official Senders are authorized to send e-mails to those of its employees as it may occasionally designate for the purpose of communicating with it; (ii) it will cause its parents, officers, directors, and employees to give their consent (in an e-mail, electronically, or in a pen-and-paper writing, as each of us may reasonably require, including as may be necessary to satisfy the CAN-SPAM Act of 2003 and CASL consent requirements) to Official Senders' transmission of e-mails to those persons, and that such persons must not opt-out, or otherwise ask to no longer receive e-mails, from Official Senders during the time that such person works for or is affiliated with it; and (iii) it will not opt-out, or otherwise ask to no longer receive e-mails, from Official Senders during the term of this Agreement.

### 16.14   Receipt of Disclosure Document and Agreement

You acknowledge having received our franchise disclosure document ("FDD") at least fourteen (14) calendar days before signing a binding agreement or making any payment to us relating to this Agreement. You acknowledge, agree, and confirm that except for the information disclosed in Item 19 of our FDD, we did not provide you (or your representatives) with data on the historic performance of Metal Supermarkets stores nor did we give you (or your representatives) data to predict the potential performance of your Store.

### 16.15   General Release

If this Agreement is not the first contract between you (and/or your affiliates) and us, then you agree to the following:

You (on behalf of yourself and your parent, subsidiaries and affiliates and their respective past and present officers, directors, shareholders, members, managers, agents and employees, in their corporate and individual capacities) and all guarantors of your obligations under this Agreement (collectively, "*Releasors*") freely and without any influence forever release and covenant not to sue Metal Supermarkets Franchising America Inc., our parent, subsidiaries and affiliates, and their respective past and present officers, directors, members, managers, shareholders, agents and employees, in their corporate and individual capacities (collectively "*Releasees*"), with respect to any and all claims, demands, liabilities and causes of action of whatever kind or nature, whether known or unknown, vested or contingent, suspected or unsuspected (collectively, "*claims*"), which any Releasor now owns or holds or may at any time have owned or held, including, without limitation, claims arising under federal, state and local laws, rules and ordinances and claims arising out of, or relating to this Agreement and all other agreements between any Releasor and any Releasee, the sale of any franchise to any Releasor, the development and operation of the Franchised Store and the development and operation of all other stores operated by any Releasor that are franchised by any Releasee. (Each party represents and warrants to the others, and agrees, that it may later learn of new or different facts, but that still, it is that party's intention to fully, finally, and forever release all of the claims that are released above. This includes the parties' waiver of state laws that might apply to limit a release (such as Calif. Civil Code Section 1542, which states that "[a] general release does not extend to claims which the creditor does not know or suspect exist in his [or her] favor at the time of executing the release, which if known by him [or her] must have materially affected his [or her] settlement with the debtor").) You expressly agree that fair consideration has been given by us for this General Release and you fully understand that this is a negotiated, complete and final release of all claims. This General Release does not release any claims arising from representations made in our Franchise Disclosure Document and its exhibits or otherwise impair or affect any claims that arise after the date of this Agreement.

[signature page to follow]

**IN WITNESS WHEREOF**, intending to be legally bound by this Agreement, the parties have executed and delivered this Agreement on the day and year first above written.

**METAL SUPERMARKETS FRANCHISING AMERICA INC.**
an Ontario corporation


By _Stephen Schober_____
Stephen Schober
President & Chief Executive Officer

**PHILLY METAL SUPPLY, LLC**
A state of Pennsylvania limited liability company partnership:


By_William Minnebo_____
William Minnebo
Managing Member


If an individual:

_____
(Signature)

_____
(Print Name)

## SCHEDULE A

### PROTECTED AREA:  CHERRY HILL, NEW JERSEY

The Protected Area as defined in this Agreement consists of the area within the following zip codes (as defined by the U.S. Postal Service as of the date of this Agreement): **APRIL 15, 2021**.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 08001 | 08002 | 08003 | 08007 | 08009 | 08012 | 08014 | 08018 | 08020 | 08021 |
| 08023 | 08025 | 08026 | 08027 | 08028 | 08029 | 08030 | 08031 | 08032 | 08033 |
| 08034 | 08035 | 08036 | 08038 | 08039 | 08043 | 08045 | 08048 | 08049 | 08051 |
| 08052 | 08053 | 08054 | 08055 | 08056 | 08057 | 08059 | 08061 | 08062 | 08063 |
| 08065 | 08066 | 08067 | 08069 | 08070 | 08071 | 08072 | 08074 | 08075 | 08076 |
| 08077 | 08078 | 08079 | 08080 | 08081 | 08083 | 08084 | 08085 | 08086 | 08090 |
| 08091 | 08093 | 08096 | 08097 | 08098 | 08099 | 08101 | 08102 | 08103 | 08104 |
| 08105 | 08106 | 08107 | 08108 | 08109 | 08110 | 08312 | 08343 | 19112 | 19148 |

For the sake of convenient reference, attached is a map showing these zip codes.  Any changes to the boundaries of these zip codes after the parties have signed this Agreement will not change the Protected Area under this Agreement.  The map is to be given priority relative to any discrepancy between the map and the zip codes as a means to define the Protected Area.



**METAL SUPERMARKETS**
**FRANCHISING AMERICA INC.**

By: *Stephen Schober*
Stephen Schober
President & Chief Executive Officer

**PHILLY METAL SUPPLY, LLC**

By: *William Minnebo*
William Minnebo
Managing Member

## SCHEDULE B

### STORE PREMISES

You agree that your Store will be operated at the following Premises (and only at that site):

### TO BE DETERMINED

**METAL SUPERMARKETS**
**FRANCHISING AMERICA INC.**

┌─DocuSigned by:

By Stephen Schober

Stephen Schober
President & Chief Executive Officer

Date: 4/14/2021

**PHILLY METAL SUPPLY, LLC**

┌─DocuSigned by:

By William Minnebo

William Minnebo
Managing Member

Date: 4/13/2021

## SCHEDULE C

### OPERATING PRINCIPAL AND FRANCHISEE ENTITY INFORMATION

You represent and warrant to us that the following is complete, accurate, and true:

1.   Operating Principal. The name and residential address of the Operating Principal is as follows:

   **WILLIAM MINNEBO, 1137 NAAMANS CREEK RD, GARNET VALLY, PA 19060
   E: WILLIAM@ZOMEA.COM;  T: 484.905.1112**

2.   Form of Entity of Franchisee.

   NAME OF FRANCHISEE: **PHILLY METAL SUPPLY, LLC**

   Please initial the applicable description of the franchisee entity and provide the requested information:

   i.   **Sole Proprietorship:** [INITIAL]

   ii.   **Corporation** – [INITIAL]

   Franchisee was incorporated on _____ under the laws of the State of
   _____. It has not conducted business under any name other than its corporate name.
   The following is a list of all of Franchisee's directors and officers as of _____.

   Name of Each Member of Board of Directors

   _____

   _____

   _____

| Name of Each Officer of Corporation | Position(s) Held |
|---|---|
| _____ | President |
| _____ | Secretary |
| _____ | Treasurer |
| _____ | Other - _____ |

iii.   **Limited Liability Company - [** ⎡ DS ⎤ WM **]**

Franchisee was formed and filed Articles of Organization as of **MARCH 16, 2021** under the laws of the State of Pennsylvania. It has not conducted business under any name other than its company. The following is a list of all of Franchisee's Members as of **APRIL 8, 2021.**

| Name of Each Member of LLC | Position(s) Held |
|---|---|
| **William Minnebo** | **Managing Member** |
| | Member |
| | Member |
| | Member |

iv.   **Partnership. [INITIAL]**

Franchisee is a General [INITIAL] Limited [INITIAL] partnership formed on _____, 202___ under the laws of the State of _____. The Franchisee has not conducted business under any name other than its partnership name. The following is a list of all of Franchisee's partners as of _____, _____: [NOTE, if Limited Partnership structure, indicate if each partner is a limited or a general partner.]

Name of Partners

_____

_____

3.   Owners. Franchisee and each of its Owners represents and warrants that the following is a complete and accurate list of all actual and beneficial Owners of Franchisee, including the full name and mailing address of each Owner, and that this fully describes the nature and extent of each Owner's interest in Franchisee. If any Owner, or owner(s) of an Owner is an entity, Franchisee shall provide us with such additional information below as necessary to identify each individual(s) who ultimately owns the actual and beneficial interests of each Owner. Franchisee, and each Owner as to his ownership interest, represents and warrants that each Owner is the sole and exclusive legal and beneficial owner of his ownership interest in Franchisee, free and clear of all liens, restrictions, agreements and encumbrances of any kind or nature, other than those required or permitted by this agreement.

Owners

Name: **WILLIAM MINNEBO**_____
Residential Address: **1137 NAAMANS CREEK ROAD, GARNET VALLEY, PA 19060**_
Interest (equity) in Franchisee as a percentage: **100%**_____

Name: _____
Residential Address: _____
Interest (equity) in Franchisee as a percentage: _____

Name: _____
Residential Address: _____
Interest (equity) in Franchisee as a percentage: _____

Submitted by Franchisee
On **4/13/2021**_____.

DocuSign Envelope ID: 44906E67-6SE5-47C2-A55D-45F5A844DF64

**PHILLY METAL SUPPLY, LLC**
(FRANCHISEE)

By William Minnebo
WILLIAM MINNEBO
MANAGING MEMBER


Owners:

William Minnebo
(Signature)

WILLIAM MINNEBO


_____
(Signature)
_____
(Print Name)


_____
(Signature)
_____
(Print Name)


_____
(Signature)
_____
(Print Name)

## SCHEDULE D

## OWNERS' PERSONAL GUARANTY OF
## FRANCHISEE'S OBLIGATIONS

In order to induce Metal Supermarkets Franchising America Inc. ("**Franchisor**") to execute the "Metal Supermarkets" Franchise Agreement between Franchisor and **PHILLY METAL SUPPLY, LLC** ("**Franchisee**"), dated **APRIL 15, 2021.** (the "**Agreement**"), each of the undersigned parties, jointly and severally, hereby unconditionally guarantee to Franchisor and its successors and assigns that all of Franchisee's obligations (monetary and otherwise) under the Agreement (and all other contracts that Franchisee has entered into with Franchisor (the "**Contracts**")) will be punctually paid and performed.

Upon demand by Franchisor, the undersigned each hereby jointly and severally agree to immediately make each payment required of Franchisee under the Agreement and any Contract and waive any right to require Franchisor to: (**a**) proceed against Franchisee for any payment required under the Agreement or any Contract; (**b**) proceed against or exhaust any security from Franchisee; (**c**) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee; and/or (**d**) give notice of demand for payment by Franchisee. Without affecting the obligations of the undersigned under this Guaranty, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee, and the undersigned each hereby jointly and severally waive notice of same and agree to be and remain bound by any and all such amendments and changes to the Agreement.

The undersigned each hereby jointly and severally agree to defend, indemnify and hold Franchisor harmless against any and all losses, damages, liabilities, costs, and expenses (including without limitation reasonable attorneys' fees, court costs, discovery costs, expert witness costs, and all other related expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement or any Contract, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

Each of the undersigned persons hereby acknowledge and agree to be individually bound by all of the Franchisee's covenants, obligations and undertakings in the Agreement and Contracts. This includes, but is not limited to, the covenants in Section 9 (generally regarding Trademarks), Section 10 (generally regarding confidentiality and covenants against competition), Section 11 (generally regarding transfers), and Section 14 (generally regarding post-termination provisions of the Agreement) of the Agreement.

The undersigned acknowledge and agree that:

(a)     this Guaranty does not grant them any rights under the Agreement or any Contract, and does not grant the right to use any of Franchisor's marks (including but not limited to the "Metal Supermarkets" marks) or the system licensed to Franchisee under the Agreement;

(b)     that they have read, in full, and understand, all of the provisions of the Agreement and each Contract that are referred to above in this paragraph, as well as Franchisor's franchise disclosure document, and that they intend to fully comply with those provisions as if they were printed here; and

(c)     that they have conducted an independent investigation of the business contemplated by the Agreement, and have had the opportunity to consult with a lawyer of their own choosing in deciding whether to sign this Guaranty.

This Guaranty will terminate upon the termination or expiration of all obligations of Franchisee under the Agreement and any Contract, except that all obligations and liabilities of the undersigned which arose from events which occurred on or before the effective date of such termination will remain in full force and effect until satisfied or discharged by the undersigned, and all covenants which by their terms continue in force after the expiration or termination of the Agreement or any Contract will remain in force according to their terms. Upon the death of an individual guarantor, the estate of such guarantor will be bound by this Guaranty, but only for defaults and obligations under this Agreement or any Contract existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

Unless specifically stated otherwise, the terms used in this Guaranty will have the same meaning as in the Agreement, and will be interpreted and construed in accordance with Section 16 of the Agreement (including but not limited to the waiver of jury trials, the agreement to bring claims within one year after the occurrence of the facts giving rise to such claim or action, the waiver (to the fullest extent permitted by law) of any right to or claim of any punitive or exemplary damages, and the exclusive application of New York law, without application of New York choice of law principles).

IN WITNESS WHEREOF, intending to be legally bound by this Guaranty, each of the undersigned has signed this Guaranty as of the date of the Agreement.

| *William Minnebo* | | |
|---|---|---|
| DocuSigned by: | | |
| (in his/her personal capacity) | (in his/her personal capacity) | (in his/her personal capacity) |
| **WILLIAM MINNEBO** | Printed Name:_____ | Printed Name:_____ |
| Date: 4/13/2021 | Date:_____ | Date:_____ |
| Home Address: **1137 NAAMANS CREEK RD GARNET VALLEY, PA 19060** | Home Address: | Home Address: |
| **T: 484.905.1112 E: WILLIAM@ZOMEA.COM** | | |

## SCHEDULE E

## ACKNOWLEDGMENT ADDENDUM TO
## METAL SUPERMARKETS FRANCHISE AGREEMENT

You and we are entering into a Franchise Agreement for the operation of a Metal Supermarkets franchise.

The purpose of this Acknowledgment is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, and to be certain that you understand the limitations on claims that may be made by you by reason of the offer and award of the franchise and operation of your business. Please review each of the following questions carefully and provide honest responses to each question.

**Acknowledgments and Representations**\*

1.  Did you receive a copy of our Franchise Disclosure Document (and all exhibits and attachments) (together, our "**FDD**") at least 14 calendar days before signing the Franchise Agreement? Check one: (✓) Yes ( ) No. If no, please explain: _____

2.  Did you study and carefully review our FDD, the Franchise Agreement, and all other agreements? Check one: (✓) Yes ( ) No. If no, please explain: _____

3.  Do you understand all the information contained in the FDD, the Franchise Agreement, and all other agreements? Check one: (✓) Yes ( ) No. If no, please explain: _____

4.  Was there any oral, written, or visual claim or representation made to you that contradicted or was different than the disclosure in the FDD? Check one: ( ) Yes (✓) No. If yes, please explain: _____

5.  Except for the information provided in Item 19 of our FDD, did anyone speaking on our behalf make any statement or representation to you (whether oral, written or visual) about how much revenue or profit you would derive (or that others have made) at any "Metal Supermarkets" location, or the likelihood of success at your franchised business? Check one: ( ) Yes (✓) No. If yes, please explain: _____

6.  Except for the information provided in Item 19 of our FDD, did anyone speaking on our behalf make any statement or representation to you (whether oral, written or visual) about the operating costs at any "Metal Supermarkets" location or business? Check one: ( ) Yes (✓) No. If yes, please explain: _____

7. Do you understand that the Franchise Agreement and related other agreements contain the entire contract between you and us concerning the franchise, meaning that any earlier statements (whether oral or written) not set out in the Franchise Agreement or other agreements will not be binding? (This does not disclaim information in our FDD) Check one: (✓) Yes ( ) No. If no, please explain: _____

_____

8. Do you understand that the success or failure of your Business will depend in large part upon your skills and experience, your business acumen, your location, the local market for products under the Metal Supermarkets Marks, interest rates, the economy, inflation, the number of employees you hire and their compensation, competition and other economic and business factors? Check one: (✓) Yes ( ) No. If no, please explain: _____

_____

9. Do you understand that the current economy and financial situation could have a negative impact on the metal industry, the Metal Supermarket franchise system and your business? Do you also understand that the economic situation may worsen? Check one: (✓) Yes ( ) No. If no, please explain: _____

_____

10. Do you understand that you are bound by the non-compete covenants (both in-term and post-term) listed in Section 10 of the Franchise Agreement and that an injunction is an appropriate remedy to protect the interests of the Metal Supermarkets System if you violate the covenant(s)? Check one: (✓) Yes ( ) No. If no, please explain: _____

_____

11. Do you understand that the term "you" for purposes of the non-compete covenants is defined broadly so that any acts in violation of the covenants by people that hold any interest in the franchisee may result in an injunction, default and termination of the Franchise Agreement? ( ) Yes (✓) No. If no, please explain: _____

_____

By signing below, you confirm your understanding that your answers are important to us and that we will rely on them. By signing this acknowledgement, you also confirm that you have carefully considered each question and responded truthfully to each such questions. If you need more space for any answer, please continue on a separate sheet and attach.

Note: If the franchisee is or will be a corporation, partnership, limited liability company, or other entity, then each of its principal owners must complete and sign a copy of this acknowledgment.

OWNERS OF FRANCHISEE:   Philly Metal Supply, LLC

Signed: _____          Signed: _____

Print Name: William Minnebo          Print Name: _____

Date: 4/8/2021          Date: _____

**FRANCHISEE:**

Signed: _____

Print Name: _William Mineto_

Title: _Member_

Date: _4/8/2021_

*All representations requiring prospective franchisees to assent to a release, estoppels or waiver of liability are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Illinois Franchise Disclosure Act or under the Maryland Franchise Registration and Disclosure Law. Nothing contained in this Addendum is intended to disclaim any of the disclosures contained in our Franchise Disclosure Document.

| | To be completed when banking institution is established |
|---|---|

## SCHEDULE F
### Electronic Transfer of Funds Authorization

Franchisee:_____
Territory:_____
Date:_____

| NEW | CHANGE |
|-----|--------|
|     |        |

Attention: Bookkeeping Department

The undersigned hereby authorizes METAL SUPERMARKETS FRANCHISING AMERICA INC. and any affiliated entity (collectively, "METAL SUPERMARKETS"), to initiate monthly ACH debit entries against the account of the undersigned with you in payment of amounts for Royalty Fees, Brand Building Fund Fees, MetalTech fees, conference fees, communication fees, Computer System and other amounts that become payable by the undersigned to METAL SUPERMARKETS. The dollar amount to be debited per payment will vary.

Subject to the provisions of this letter of authorization, you are hereby directed to honor any such ACH debit entry initiated by METAL SUPERMARKETS.

This authorization is binding and will remain in full force and effect until 90 days prior written notice has been given to you by the undersigned. The undersigned is responsible for, and must pay on demand, all costs or charges relating to the handling of ACH debit entries pursuant to this letter of authorization.

Please honor ACH debit entries initiated in accordance with the terms of this letter of authorization, subject to there being sufficient funds in the undersigned's account to cover such ACH debit entries.

Sincerely yours,

**\*\*\* We also need a VOIDED Check \*\*\***

_____
Account Name

_____
Bank Name

_____
Street Address

_____
Branch

_____
City          State          Zip Code

_____
Street Address

_____
Telephone Number

FRANCHISEE: _____

By_____
(Signature)

_____
City          State          Zip Code

_____
(Print Name)

_____
Bank Telephone Number

Its_____
(Title)

_____
Bank's Account Number

Date_____

_____
Customer's Account Number

## SCHEDULE H-1

### Assignment of Telephone Numbers

This assignment between MSKS IP Inc. ("we" or "us") and **PHILLY METAL SUPPLY, LLC** ("you") is effective as of **APRIL 15, 2021.**  You hereby irrevocably assign to us or our designee the telephone number or numbers and listings issued to you now or in the future with respect to your Metal Supermarkets business including, but not limited to, the following numbers ("telephone numbers"): **TO BE DETERMINED**

We hereby are authorized and empowered without any further notice to you to notify the telephone company, as well as any other company that publishes telephone directories ("telephone companies"), to transfer the telephone numbers to us or such other person or entity as we designate. You hereby grant to us an irrevocable power of attorney and appoint us as your attorney-in-fact to take any necessary actions to assign the telephone numbers, including but not limited to, executing any forms that the telephone companies may require to effectuate the assignment. This assignment is also for the benefit of the telephone companies, and the telephone companies may accept this assignment and our instructions as conclusive evidence of our rights in the telephone numbers and our authority to direct the amendment, termination or transfer of the telephone numbers, as if they had originally been issued to us. In addition, you agree to hold the telephone companies harmless from any and all claims against them arising out of any actions or instructions by us regarding the telephone numbers.

PHILLY METAL SUPPLY, LLC

By: _William Minnebo_____
William Minnebo
Managing Member
Date: __4/13/2021_____

MSKS IP INC.

By: _Stephen Schober_____
Stephen Schober
President & Chief Executive Officer

## SCHEDULE H -2

### Assignment of Domain Names, URLs and E-Mail Addresses

This assignment between MSKS IP Inc. ("we" or "us") and **PHILLY METAL SUPPLY, LLC** ("you") is effective as of **APRIL 15, 2021**. You hereby irrevocably assign to us or our designee the domain names, URLs and e-mail addresses issued to you with respect to your Metal Supermarkets business including, but not limited to, the following: **TO BE DETERMINED**.

You agree to pay or reimburse us all amounts, whether due and payable or not, that any domain name registry ("Registry") or Internet Service Provider ("ISP") may require in connection with such transfer.

We are hereby authorized and empowered without any further notice to you to notify the Registry and the ISP to transfer the domain names, URLs and e-mail addresses to us or such other person or firm as is designated by us. In furtherance thereof, you hereby grant an irrevocable power of attorney to us and appoint us as your attorney-in-fact to take any necessary actions to assign the domain names and e-mail addresses, including but not limited to, executing any forms that the Registry and the ISP may require to effectuate the assignment. This assignment is also for the benefit of the Registry and the ISP, and the Registry and the ISP may accept this assignment and our instructions as conclusive evidence of our rights in the domain names and e-mail addresses and our authority to direct the amendment, termination or transfer of the domain names and e-mail addresses, as if they had originally been issued to us. In addition, you agree to hold the Registry and the ISP harmless from any and all claims against them arising out of any actions or instructions by us regarding the domain names and e-mail addresses.

PHILLY METAL SUPPLY, LLC

By: *William Minnebo*

William Minnebo

Managing Member

Date: 4/13/2021

MSKS IP INC.

By *Stephen Schober*

Stephen Schober

President & Chief Executive Officer



## Certificate Of Completion

Envelope Id: 44900E67C6E847C2A55075F5A841DF94
Subject: Please DocuSign: MSFA - Hosting - Cherry Hill - Philly Metal Supply - W Minnebo - Apr 15 2021.p...
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 109 | Signatures: 19 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 1 | Diane Goldsmith |
| AutoNav: Enabled | | 1900 Oakcrest Avenue |
| EnvelopeId Stamping: Enabled | | Suite 5 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Roseville, MN  55113 |
| | | corporate@metalsupermarkets.com |
| | | IP Address: 72.142.25.246 |

**Status: Completed**

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Diane Goldsmith | Location: DocuSign |
| 4/9/2021 7:37:59 AM | corporate@metalsupermarkets.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| William Minnebo<br>William@zomea.com<br>Philly Metal Supply, LLC<br>Security Level: Email, Account Authentication (None) | <br>William Minnebo<br>SD0906907278486...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 96.114.28.194 | Sent: 4/9/2021 7:51:54 AM<br>Viewed: 4/9/2021 7:52:54 AM<br>Signed: 4/13/2021 7:09:59 PM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 4/9/2021 7:52:54 AM<br>  ID: 2fb9f5b4-ed99-4c86-b4f5-7419ec584408 | | |
| Stephen Schober<br>sschober@metalsupermarkets.com<br>President<br>Security Level: Email, Account Authentication (None) | <br>Stephen Schober<br>987C4CEA0C954BD...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 72.142.25.246 | Sent: 4/13/2021 7:10:02 PM<br>Viewed: 4/14/2021 3:57:58 AM<br>Signed: 4/14/2021 4:00:29 AM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 4/14/2021 3:57:58 AM<br>  ID: 7c2acefd-49dc-4251-93c5-4865cc46e479 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 4/9/2021 7:51:54 AM |
| Certified Delivered | Security Checked | 4/14/2021 3:57:58 AM |
| Signing Complete | Security Checked | 4/14/2021 4:00:29 AM |
| Completed | Security Checked | 4/14/2021 4:00:29 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

GLO-L-000791-22 08/05/2022 9:28:38 AM Pg 70 of 72 Trans ID: LCV20222838123
Electronic Record and Signature Disclosure created on 9/15/20 OCID 1398 AM-1 Filed 10/11/22 Page 92 of 98 PageID: 97
Parties agreed to: William Minnebo, Stephen Schober

## CONSUMER DISCLOSURE

From time to time, Metal Supermarkets Franchising America Inc. (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures

electronically from us.

**How to contact Metal Supermarkets Franchising America Inc.:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

To contact us by email send messages to: jblight@metalsupermarkets.com

**To advise Metal Supermarkets Franchising America Inc. of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at jblight@metalsupermarkets.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from Metal Supermarkets Franchising America Inc.**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to jblight@metalsupermarkets.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Metal Supermarkets Franchising America Inc.**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

 i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

 ii. send us an e-mail to jblight@metalsupermarkets.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| | |
|---|---|
| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

\*\* These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC CONSUMER DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Metal Supermarkets Franchising America Inc. as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Metal Supermarkets Franchising America Inc. during the course of my relationship with you.

# EXHIBIT B



The Convenience Stores For Metal®

**Metal Supermarkets**
**Franchising America Inc**.

5399 Eglinton Avenue West, Suite 210
Toronto, ON Canada M9C 5K6
Tel: (905) 362-8226
Fax: (905) 362-0925

June 4, 2022

Philly Metal Supply, LLC
dba Metal Supermarkets Deptford
Attention:  William Minnebo, Managing Member & Operating Partner
1137 Naamans Creek Road
Garnet Valley, PA  19060
T:  484.905.1112
E:  william@zomea.com

VIA EMAIL AND FEDEX OVERNIGHT DELIVERY

Mr. William Minnebo
Shareholder and Guarantor of Philly Metal Supply, LLC
1137 Naamans Creek Road
Garnet Valley, PA  19060

Dear Will:

**RE: Termination of Philly Metal, LLC - Metal Supermarkets Franchising America Inc. Franchise Agreement**

This letter is a Notice of Termination of the franchise agreement (the "Franchise Agreement") dated April 15, 2021, between Philly Metal Supply, LLC (the "Franchisee") and Metal Supermarkets Franchising America Inc. ("MSFA" or "Franchisor"). The Franchise Agreement granted a license for the establishment and operation of a franchised "Metal Supermarkets" business operated at **1030 Delsea Drive, Unit 9S, Deptford, NJ 08093** (the "Store").

By letter dated June 2, 2022, your counsel, William Jameson, stated that you had elected to close your franchised Metal Supermarkets store effective June 6, 2022.  By email of June 3, 2022, you informed MSFA that you were ceasing to monitor your Metal Supermarkets email accounts at the close of business that day.  You subsequently confirmed that you would not be opening for business today, June 4, 2022.

Your election to cease the operation of your franchised Metal Supermarkets business prior to the end of the term of the Franchise Agreement constitutes a breach of the Franchise Agreement, and an abandonment of the franchise.  In accordance with section 12.2 (h) and N.J.S.A. section 10-5, the Franchise Agreement will terminate fifteen (15) days from the earlier of your first receipt or the first attempted delivery of this letter.

MSFA hereby references, although not exhaustively, the provisions of the Franchise Agreement that survive the termination or expiration of that contract and further references the provisions of the Franchise Agreement that take effect upon termination or expiration of that contract (together, the "Post Termination Obligations"), all of which will become effective on the termination date.

These include, but are not limited to, the following:

- Sections 10.1, 14.2(e), and 14.3 (confidentiality-related clauses);

- 2 -

- Section 10.4 (post-term covenants against completion);

- Section 10.5 (non-solicitation of customers and vendors);

- Section 14.1 (the obligation to pay all amounts outstanding to MSFA);

- Sections 14.2(a), 14.2(b), and 14.2(c) (the obligation to stop using MSFA's trademarks);

- Sections 14.2(f) and 14.2(g) (the obligation to stop using all technology and communications methods associated with the system, and the obligation to transfer to MSFA all telephone numbers, domain names, and other electronic addresses associated with the Store);

- Section 8.1 (the obligation to maintain at the Premises, and upon request, provide to MSFA, the Store's electronic and physical books and records);

- Section 15.2 (the obligation to indemnify MSFA and the Indemnitees against claims relating to the operation (and closure) of the Store, on the terms specified in said Section 15.2);

- Section 14.4 (the obligation to sell certain assets to MSFA, which MSFA shall have the option to exercise within thirty (30) days after the date of termination on the terms specified in Section 14.4); and

- Section 14.4 (the obligation to assign to MSFA the lease for the Premises).

We also call to your attention the provisions of the Franchise Agreement that provide for MSFA's exclusive ownership of the customer lists (section 14.3) and telephone numbers, email addresses, URLs, domain names, and social media platforms (section 4.4(b) used in the franchised business.

MSFA reserves the right to pursue all of its legal and equitable remedies.

Regards,
**METAL SUPERMARKETS FRANCHISING AMERICA INC.**

Stephen Schober,
President & CEO

cc:     Andrew Arminen, Chief Operations & Development Officer
        Ryan Shorten, Director of Franchise Operations & Services